Slip Op. 17-70

# UNITED STATES COURT OF INTERNATIONAL TRADE

MITSUBISHI POLYESTER FILM, INC. and
SKC, INC.,

       Plaintiffs,

v.

UNITED STATES,

       Defendant,

and

TERPHANE, INC. and TERPHANE, LTDA.,

       Defendant-Intervenors.

Before: Gary S. Katzmann, Judge

Court No. 13-00062

## OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record is granted in part and denied in part. Commerce's determination under 19 C.F.R. § 351.225(k)(1) as to Defendant-Intervenors' Copolymer Surface Products is remanded.]

Dated: June 8, 2017

Jeffrey I. Kessler, Wilmer, Cutler, Pickering, Hale and Dorr, LLP, of Washington, DC, argued for Plaintiff. With him on the brief were Ronald I. Meltzer, Patrick J. McLain, and David M. Horn.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Jane C. Dempsey, Trial Attorney, and Mykhaylo Gryzlov, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

J. Michael Taylor and Stephen A. Jones, King & Spalding, LLP, of Washington, DC, argued for Defendant-Intervenors. With them on the brief was Shannon M. Doyle.

Katzmann, Judge:  Polyethylene terephthalate ("PET") is all around us.  PET is a polymer

with a great number of uses—for instance, PET film could be found in tamper-evident food

packaging such as potato chip bags and safety seals, in frozen and refrigerated food packaging, in

laminated materials such as traffic signs, in printable products used in graphical media, in the

scratch-resistant coverings of smartphones, and in protective coverings that shield sensitive

equipment from UV radiation, to name but a few applications.  In this case the court considers

whether a particular set of PET products manufactured abroad by Terphane, Ltda. and imported

by Terphane Inc. (collectively "Terphane"), falls within the scope of a duly issued antidumping

duty order on imports of certain PET products. The basic question is whether the Department of

Commerce's ("Commerce") determination that Terphane's products were not within the scope of

the antidumping duty order was supported by substantial evidence and in accordance with law.

The court concludes that Commerce reasonably determined that the language of the order was

ambiguous with respect to whether it includes films like Terphane's.  The court also concludes

that Commerce's analysis in determining that Terphane's films are not dispositively in scope is

deficient and unsupported by substantial evidence.  Accordingly, the case is remanded for further

proceedings.

Generally speaking, PET film production begins with the polymerization process, in which

the combination of certain chemicals and additives, heated in multiple rounds and then cooled,

forms PET pellets or "chips."  The next phase is extrusion.  The PET chips are melted and then

squeezed through a die, cooled, heated, and manipulated to a specified length or width.  "Co-

extrusion" by contrast involves the simultaneous extrusion of polymer from multiple lines through

a single die; in other words, extrusion involves only one stream of polymer, whereas co-extrusion

involves multiple streams of polymer that may differ in their chemical makeup and physical

properties.  At the time of co-extrusion, these multiple outputs may be stacked or alternated to

form a single, layered, co-extruded PET product.  After extrusion or co-extrusion, the molten

polymer substance is cooled, and then stretched to form a film.  The PET product may still be

altered or treated in some way, such as through the addition of another layer or coating to a side

of the PET; this may occur "in-line," as part of the manufacturing process, or "off-line."  Thereafter

it is trimmed and bound as necessary.  The many variables in these procedures permit the

customizability in performance characteristics necessary to vend PET to a broad and highly diverse

market.

This matter comes before the court on the Motion of Plaintiffs Mitsubishi Polyester Film,

Inc. and SKC, Inc. (collectively "Mitsubishi") for Judgment on the Agency Record, pursuant to

USCIT Rule 56.2, with regard to the determination by Commerce issued in the "Antidumping

Duty Order on PET Film, Sheet, and Strip from Brazil: Final Scope Ruling, Terphane, Inc. and

Terphane Ltda." (Jan. 7, 2013), PD 35 ("Terphane Scope Ruling" or "Scope Ruling").  Mitsubishi

argues that a number of legal and factual determinations in the Scope Ruling, in which Commerce

found that certain of Terphane's PET film products are outside of the scope of the underlying

antidumping duty order, are contrary to law and, alternately, unsupported by substantial evidence

on the record pursuant to Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, as amended, 19

U.S.C. § 1516a(b)(1)(B)(i).[1]  Pl.'s Mot. for J. on the Agency R. and Br. in Supp., Aug. 2, 2013,

ECF No. 22 ("Pl.'s Br."); Pl.'s Reply, Feb. 3, 2014, ECF No. 38 ("Pl.'s Reply"); Pl.'s Compl.,

Mar. 8, 2013, ECF No. 13 ¶ 11 ("Pl.'s Compl.").  Mitsubishi thus seeks remand.[2]  Pl.'s Compl. ¶

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition, and all applicable amendments thereto, unless otherwise noted.

[2] Mitsubishi also argues that Commerce's failure to issue the Scope Ruling within 45 days of the submission of the scope application renders it invalid.   Pl.'s Compl. ¶ 26–27.

28.  Defendant United States (or "the Government") and defendant-intervenors Terphane oppose

plaintiffs' motion.  Def.'s Opp'n, Dec. 4, 2013, ECF No. 29 ("Def.'s Opp'n"); Def.-Inter.'s Opp'n,

Dec. 4, 2013, ECF No. 31 ("Def.-Inter.'s Opp'n").

## BACKGROUND

I.      **Legal Framework**

Under the antidumping statute, Commerce imposes duties on imported merchandise that

"is being, or is likely to be, sold in the United States at less than fair value," i.e. "dumped," and

harms domestic industry.  19 U.S.C. §§ 1673, 1677(34).  An industry, which "means the producers

as a whole of a domestic like product,"[3] 19 U.S.C. § 1677(4)(A), may petition Commerce to initiate

a dumping investigation pursuant to § 1673a(b).  A petition must be filed "by or on behalf of the

industry," and must "allege[ ] the elements necessary for the imposition of the duty . . .

accompanied by information reasonably available to the petitioner supporting those allegations."

19 U.S.C. § 1673a(b)(1), (c)(1)(A), (c)(4)(A).

If Commerce determines that a petition meets these requirements, it initiates an

investigation.  19 U.S.C. § 1673a(a)(1).  Commerce then collects information from foreign

producers and makes a preliminary determination as to the extent of alleged dumping.  19 U.S.C.

§ 1673b(b).  The International Trade Commission ("ITC") meanwhile collects information from

the affected domestic industry and makes a preliminary determination as to whether material injury

or a threat thereof exists.  19 U.S.C. § 1673b(a).  Within seventy-five days of its own preliminary

determination, Commerce shall make a final determination regarding the existence and extent of

---

[3] Domestic like product, meanwhile, is "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(10).

dumping.  19 U.S.C. § 1673d(a).  If that determination is affirmative, the ITC will make a final

determination as to material injury or threat thereof to the affected domestic industry.  19 U.S.C.

§ 1673d(b).  If the ITC's determination is also affirmative, then Commerce shall publish an

antidumping duty order that "includes a description of the subject merchandise, in such detail as

the administering authority deems necessary."  19 U.S.C. § 1673e(a)(2).

When a question arises as to whether a particular product is included in an antidumping

duty order, an interested party may apply for a scope ruling from Commerce.  19 C.F.R. §

351.225(a), (c) (2012); see 19 U.S.C. § 1516a(a)(2)(B)(vi).  While no specific statutory provision

governs the interpretation of the scope of antidumping duty orders, Commerce has filled the

statutory gap with a regulatory framework, which has been interpreted by the Federal Circuit and

this Court into a three-step process.  See Meridian Prod., LLC v. United States, 851 F.3d 1375,

1381 (Fed. Cir. 2017) (citing Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776

F.3d 1351, 1354 (Fed. Cir. 2015)); 19 C.F.R. § 351.225.

The plain language of the antidumping duty order is "paramount" in determining whether

particular products are included within its scope.  Fedmet Res. Corp. v. United States, 755 F.3d

912, 918 (Fed. Cir. 2014) (citing King Supply Co. LLC v. United States, 674 F.3d 1343, 1345

(Fed. Cir. 2012)).  Thus "Commerce's inquiry must begin with the order's scope to determine

whether it contains an ambiguity and, thus, is susceptible to interpretation."  Meridian Prod., 851

F.3d at 1381; see Fedmet, 755 F.3d at 923–24 ("[T]he first step of a scope ruling proceeding is to

determine whether the governing language is in fact ambiguous." (citing ArcelorMittal Stainless

Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012))).  "[B]ecause the meaning and scope

of . . . orders are issues particularly within [Commerce's] expertise and special competence,"

Commerce is entitled to "substantial deference" with regard to interpretation of its own

antidumping duty orders.  Meridian Prod., 851 F.3d at 1381–82 (citing King Supply, 674 F.3d at 1348).  If the language of the order is unambiguous, its plain meaning governs, and the analysis ends.  ArcelorMittal, 694 F.3d at 87.

If the language is ambiguous, Commerce must review it in light of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the [ITC]." 19 C.F.R. § 351.225(k)(1) ("(k)(1) evidence" or "(k)(1) factors"); Fedmet, 755 F.3d at 918.  These descriptions however "'cannot substitute for language in the order itself' because '[i]t is the responsibility of [Commerce], not those who [participated in] the proceedings, to determine the scope of the final orders.'" Meridian Prod., 851 F.3d at 1382 (quoting Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002)).  If these factors are dispositive, the analysis ends.  To be dispositive, the (k)(1) factors must be controlling of the scope inquiry in the sense that they definitively answer the scope question.  Id. at 1382 n.8 (citing Sango Int'l, L.P. v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007)).

Only if Commerce's analysis under the (k)(1) factors is not dispositive may the agency consider those factors set forth in 19 C.F.R. § 351.225(k)(2):  (i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed.  See Meridian Prod., 851 F.3d at 1382; see generally Diversified Prod. Corp. v. United States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983) (enunciating the (k)(2) factors prior to their codification).

## II.   The Antidumping Duty Order and Terphane's Scope Ruling Request

On September 28, 2007, Mitsubishi, along with Dupont Teijin Films and Toray Plastics (America), Inc., filed an antidumping dumping duty petition covering "all PET film imported into the United States from Brazil, China, Thailand and the UAE."[4] Polyethylene Terephthalate Film. Sheet, and Strip From Brazil, People's Republic of China, Thailand and the United Arab Emirates, Antidumping Duty Petition at 9 (Sept. 28, 2007) ("Petition"), in Terphane's Scope Ruling Request Letter at Ex. 23, PD 1–3, CD 1–4 ("Scope Ruling Request"); Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from Brazil, the People 's Republic of China, Thailand, and the United Arab Emirates: Initiation of Antidumping Duty Investigations, 72 Fed. Reg. 60,801 (Dep't Commerce Oct. 26, 2007) (initiation of investigation).   In proposing the domestic like product to be investigated, petitioners suggested the definition used by the ITC in its investigations into PET products from India and Taiwan:

> [A]ll gauges of raw, pretreated, or primed PET film, whether extruded or coextruded.  Excluded are metallized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick.

Petition at 9; Polyethylene Terephthalate Film, Sheet and Strip From India and Taiwan, USITC Publication No. 3518, Inv. Nos. 701-TA-415 and 731-TA-933-934 (June 2002) (Final), at 4 in Scope Ruling Request at Ex. 27.

---

[4] The court in this opinion refers occasionally to "petitioners" to describe the parties who filed the antidumping duty petition with Commerce.  Mitsubishi, whose constituents, Mitsubishi Polyester Film, Inc. and SKC, Inc., were among the petitioners, is now plaintiff in the instant litigation.

The Period of Investigation was July 1, 2006 through June 30, 2007. 72 Fed. Reg. at 60,803. Petitioners identified one respondent, Terphane Ltda.,[5] a Brazilian producer of PET film. Id. Commerce issued its preliminary determination of sales at less than fair value on May 5, 2008, and its final determination on September 24, 2008, in each making an affirmative determination of dumping of PET film from Brazil. Notice of Preliminary Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip from Brazil, 73 Fed. Reg. 24,560 (Dep't Commerce) (preliminary determination); Notice of Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip from Brazil, 73 Fed. Reg. 55,035 (Dep't Commerce) (final determination). Commerce assigned Terphane a weighted-average dumping margin of 44.36%. 73 Fed. Reg. at 55,036. Commerce issued the antidumping duty order on PET Film from Brazil on November 10 of that year.[6] Polyethylene Terephthalate Film, Sheet, and Strip from Brazil, the People's Republic of China and the United Arab Emirates: Antidumping Duty Orders and Amended Final Determination of Sales at Less than Fair Value for the United Arab Emirates, 73 Fed. Reg. 66,595 (Dep't Commerce Nov. 10, 2008) ("Order"). The scope of the Order was identical to the scope of the investigation, both containing substantially the

---

[5] Terphane, Inc., also defendant-intervenor, is a U.S. domestic producer of PET Film that imports merchandise from Terphane Ltda. Def.-Inter.'s Mot. to Interv., Feb. 12, 2013, ECF No. 6, at 2; Def.-Inter.'s Opp'n at 1.

[6] The ITC made a preliminary determination "that there is a reasonable indication that an industry in the United States is materially injured by reason of imports" of PET film from Brazil, China, and the United Arab Emirates. Polyethylene Terephthalate Film, Sheet, & Strip from Brazil, China, Thailand, & the United Arab Emirates, USITC Pub. 3962, Inv. No. 731-TA-1131–1134 (Nov. 2007) (Preliminary); see 19 U.S.C. § 1673b(a). The ITC made a final determination "that an industry in the United States is threatened with material injury by reason of" such imports. Polyethylene Terephthalate Film, Sheet, & Strip from Brazil, China, Thailand, & the United Arab Emirates, USITC Pub. No. 4040, Inv. No. 731-TA-1131–1134 (Oct. 2008) (Final); see 19 U.S.C. § 1673d(b).

language proposed by petitioners.  Id. at 66,595–96; see 19 U.S.C. § 1673e(a)(2) (directing that an

antidumping duty order "includes a description of the subject merchandise, in such detail as the

administering authority deems necessary").  Specifically:

> The products covered by each of these orders are all gauges of raw,
> pre-treated, or primed PET film, whether extruded or co-extruded.
> Excluded are metallized films and other finished films that have had
> at least one of their surfaces modified by the application of a
> performance-enhancing resinous or inorganic layer more than
> 0.00001 inches thick. Also excluded is roller transport cleaning film
> which has at least one of its surfaces modified by application of 0.5
> micrometers of SBR latex. Tracing and drafting film is also
> excluded. PET film is classifiable under subheading 3920.62.00.90
> of the Harmonized Tariff Schedule of the United States (HTSUS).
> While HTSUS subheadings are provided for convenience and
> customs purposes, our written description of the scope of these
> orders is dispositive.

Order at 66,595–96.

In February 2012, Terphane requested a scope ruling to determine whether four of the PET

film products it produces in and imports from Brazil, and sells in the United States (collectively

"Copolymer Surface Films"), are subject to the Order.[7]  Scope Ruling Request at 1–2.  Terphane

asserted that its Copolymer Surface films are not covered by the scope of the Order because they

all "have a performance-enhancing resinous layer that exceeds the thickness requirement listed in

the scope exclusion." Id. at 3.  This layer is a copolymer resin which Terphane refers to publicly

as COEX.  Id. at 5.  COEX possesses chemical properties different from the core PET layer or

layers to which it is conjoined through co-extrusion.  Id. at 9–14.  Terphane submitted evidence

supporting its assertion that the COEX layer's physical-chemical makeup provides it with

---

[7] These film products are: (1) 10.21132, 10.21140, 10.21148, and 10.21192 (collectively "10.21
products"); (2) 10.81148 ("10.81 product"); (3) 10.91148 ("10.91 product"); and (4) 10.96/48
("10.96 product").  Scope Ruling Request at 2; Scope Ruling at 1.

performance-enhancing properties, and, despite variations in thickness across products, is invariably of thickness greater than 0.00001 inches. Id. at 11–12, Ex. 10. Terphane identified its relevant products as "Equivalent PET film," characterizing equivalent PET film as differing from PET film by the presence of a coating of sufficient thickness on the former, regardless of whether applied in-line or otherwise. Id. at 18 ("Equivalent PET Films, like Terphane's Copolymer Surface Films, are outside of the scope of the antidumping duty order on PET film from Brazil."), 20–23. Terphane mentioned the ITC's 1991 investigation on PET film from Japan and Korea, wherein the Commission noted that "U.S. producers view all PET film (excluding equivalent PET film) as a continuum of PET film products . . . ." Id. at 20; Polyethylene Terephthalate Film, Sheet, and Strip from Japan and the Republic of Korea, USITC Pub. 2383, Inv. Nos. 731-TA-458 and 459 (May 1991) (Final) at 12 ("ITC Japan and Korea PET Investigation"), in Scope Ruling Request at Ex. 25. Terphane noted also the ITC's analysis of equivalent PET film and its discussion of two equivalent PET film products, Cronar and Estar, and reiterated the similarities between them and its own Copolymer Surface films.[8] Scope Ruling Request at 20; ITC Japan and Korea PET Investigation at 15–16.

Petitioners commented on Terphane's request on March 23, 2012. Petitioner's Comments on Terphane's Scope Ruling Request, PD 9, CD 5 ("Pets' Mar. 23 Comments").[9] Terphane replied

---

[8] For example, Terphane stated that "[l]ike the film discussed by the Commission, Terphane's Copolymer Surface Films have a performance-enhancing resinous surface layer with adhesive characteristics that generally are favored for the ease with which graphics can be printed on the films." Scope Ruling Request at 20.

[9] Petitioners therein contended inter alia that Terphane's films fall within the order's scope, that "equivalent PET films" only encompass films with highly specialized down-stream end uses and coatings applied through off-line or dedicated production equipment, and that primed PET co-extrusions are not "finished" such that they would be excluded from the order. Pets' Mar. 23 Comments at 20–29.

on May 7.  Terphane's Reply to Petitioners' Comments on Terphane's Scope Ruling Request, PD 17, CD 9 ("Terphane's May 7 Comments").   In April, Commerce issued questionnaires to Terphane and petitioners, the responses to which came in May.   Terphane's Questionnaire Response, PD 18, CD 10 (May 7, 2012) ("Terphane's QR"); Petitioners' Questionnaire Response, PD 21–22, CD 12–14 (May 7, 2012) ("Pets' QR").   Terphane and petitioners commented on each other's questionnaire responses the same month.   Terphane's Comments on Petitioners' Questionnaire Responses, PD 23, CD 15 (May 17, 2012); Petitioners' Response to Terphane's Questionnaire Response, PD 24, CD 16 (May 17, 2012).   On June 7, Terphane responded to petitioners' May 17 comments, and on June 18, petitioners submitted rebuttal comments to Terphane's June 7 comments.  Terphane June 7 Response to Petitioners' May 17 Comments, PD 29, CD 17 ("Terphane's June 7 Response"); Petitioners' June 18 Rebuttal to Terphane's June 7 Response, PD 30, CD 18.

Commerce issued the Terphane Scope Ruling on January 7, 2013.  Scope Ruling at 1.  The agency did not issue its ruling within forty-five days of Terphane's request in accordance with 19 C.F.R. § 351.225(c)(2),[10] but instead took 320 days from the submission of the application.

Relying on the 19 C.F.R. § 351.225(k)(1) criteria, Commerce found that "Terphane's products are outside the scope of the order, provided that the added performance-enhancing resinous layer is greater than 0.00001 inches thick, as determined by U.S. Customs and Border Protection (CBP)."  Scope Ruling at 1.  Of the scope language, Commerce reasoned that "even though a particular product may meet the requirements of the first sentence . . . it may also fall

---

[10] "Deadline for action on application. Within 45 days of the date of receipt of an application for a scope ruling, the Secretary will issue a final ruling under paragraph (d) of this section or will initiate a scope inquiry under paragraph (e) of this section."  19 C.F.R. § 351.225(c)(2).

under one of the subsequent exclusions and be excluded from the scope of the order," which "is

consistent [sic] Department's prior determinations." Scope Ruling at 11.

     Commerce also determined that "[t]he exclusion described in sentence two of the scope . .

. refers to a specific category of products which the ITC identified as 'equivalent PET film.'" Scope

Ruling at 4.  Commerce focused on the ITC's 1991 definition, as part of the antidumping duty

investigations of PET film from Japan and Korea, of DuPont Cronar and Kodak Estar films, along

with "those products equivalent to Cronar and Estar," as "equivalent PET film." Scope Ruling at

4; ITC Japan and Korea PET Investigation at 15.  Commerce reasoned that "the scope language

should not be interpreted as to render as subject films identical to DuPont's Cronar and Estar,

which . . . are the paradigmatic examples of films covered by the so-called '0.00001-inch

exclusion.'"[11]  Scope Ruling at 12.  Commerce further reasoned, because Cronar and Estar are

designed for further manufacturing, per evidence provided by Terphane, the first sentence of the

scope parameters "should not be interpreted so broadly as to encompass all films which are

designed for further manufacturing, to be more receptive to further coating, and/or to be more

adhesive, which both parties agree are characteristic of primed and certain pre-treated films." Id.

In addition, Commerce concluded that while the COEX layer may provide characteristics of a

primer or a pre-treatment, it also provides "additional performance-enhancing capabilities similar

to those of Cronar and Estar." Id.

     Commerce determined that the phrase "extruded or co-extruded" encompasses PET

products regardless of which extrusion method is used, and "does not indicate that all extruded

---

[11] As noted below, see infra p. 26, Commerce now acknowledges that it erred in stating that "Terphane has provided evidence that indicates that Cronar and Estar are co-extruded." Terphane Scope Ruling at 12; Def.'s Opp'n at 7.

and/or co-extruded films are covered, regardless of the subsequent exclusions." Scope Ruling at 12.

Commerce determined Terphane's films to be "finished films," reasoning that the phrase "other finished films" must include some films that are also "raw, pre-treated, or primed PET films," as reading it otherwise would obviate the word "finished." Id. Thus, "the term 'finished films' should not be interpreted so narrowly as to exclude all films covered by the first sentence of the scope or so broadly that it includes all such films." Id.

Commerce considered two of its own prior scope rulings:  Garware and Avery Dennison.[12] Id.  In Garware, Commerce found that Garware's tracing and drafting film had a performance-enhancing layer more than 0.00001 inches thick, thus excluding it from the underlying antidumping and countervailing duty orders on PET from India.  Garware at 1; see 67 Fed. Reg. 44,175 (Dep't Commerce July 1, 2002) (amended antidumping duty order); 67 Fed. Reg. 44,179 (Dep't Commerce July 1, 2002) (countervailing duty order).[13]  Commerce found that Garware,

---

[12] Antidumping and Countervailing Duty Orders on Polyethylene Terephthalate Film, Sheet, and Strip from India, Final Scope Ruling--Requested by International Packaging Films, Inc. Regarding Tracing and Drafting Film (Aug. 25, 2013) ("Garware") at Scope Ruling Request at Ex. 31; Memorandum from Michael J. Heaney to Stephen J. Claeys, Antidumping Duty Investigations on Polyethylene Terephthalate Film, Sheet, and Strip (PET film) from Brazil, the People's Republic of China, Thailand, and the United Arab Emirates, A-351-841, A-570-924, A-549-825, A-520-803 (investigations), Apr. 25, 2008 ("Avery Dennison") at Pets' Mar. 23 Comments at Ex. 9; see Polyethylene Terephthalate Film, Sheet and Strip (PET Film) from Brazil, the People's Republic of China, Thailand, and the United Arab Emirates, Avery Dennison's Comments on the Proposed Scope of the Investigations (Nov. 15, 2007) at Scope Ruling Request at Ex. 30.

[13] The operative language in the first two sentences of the scope in these orders is identical to that of the instant case.  In full, the scope reads:

> For purposes of this order, the products covered are all gauges of raw, pretreated, or primed PET film, whether extruded or coextruded. Excluded are metallized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer

despite involving a matte lacquer layer much different than the COEX layer in Terphane's case,

was relevant insofar as both reviews involved performance-enhancing resinous or inorganic layers.

Scope Ruling at 13; Garware at 3–4.  In regards to Avery Dennison, which arose from Commerce's

investigation on dumping of PET from Brazil, the United Arab Emirates, and the People's

Republic of China, Commerce reaffirmed its finding therein "that the scope of the order is not

limited to base PET films, or PET film prior to the application of any in-line coatings."   Scope

Ruling at 13; Avery Dennison at 5–6.  The products at issue in that review, however, were

definitely shown not to have a layer which was over 0.00001 inches.  Commerce thus disagreed

with petitioners' argument that the Department based its decision in that ruling on the in-line co-

extrusion production method used to create the products at issue, and emphasized that the chemical

composition of the silicon layer in that ruling is not relevant vis-à-vis the chemical composition of

the co-extruded COEX layer at issue in Terphane's ruling.  Scope Ruling at 13.[14]

Commerce concluded that

> Terphane's copolymer surface film products, as described by
> Terphane, are finished films which have a performance-enhancing
> resinous layer, and are therefore outside of the antidumping duty

---

> of more than 0.00001 inches thick. Imports of PET film are
> classifiable in the Harmonized Tariff Schedule of the United States
> (HTSUS) under item number 3920.62.00. HTSUS subheadings are
> provided for convenience and Customs purposes. The written
> description of the scope of this order is dispositive.

67 Fed. Reg. at 44,176, 44,179.

[14] Commerce found the copolymer COEX layer applied to each of the Copolymer Surface films
to be "'performance-enhancing,' 'resinous,' and a bona fide 'layer,'" possessing of characteristics
and capabilities similar to Cronar and Estar.  Scope Ruling at 12–13.  The finding that the COEX
layer itself is "performance-enhancing" for the purposes of the second sentence exclusion is not
challenged in the instant litigation.  Terphane maintains COEX's physiochemical properties allow
customers to print, laminate, coat, or metalize the film without applying a primer or surface
treatment, and allow the film to be heat sealed.  Id. at 4, 12–13.

> order on PET film, sheet, and strip from Brazil, provided Terphane
> can establish, to the satisfaction of CBP, that the performance-
> enhancing layer is greater than 0.00001 inches thick.

Id. at 14.  Commerce found its consideration of the 19 C.F.R. § 351.225(k)(1) criteria to be

dispositive with respect to Terphane's Copolymer Surface films, and so did not progress to

consideration of the criteria under 19 C.F.R. § 351.225(k)(2).  Id. at 2–3, 14.

## III.  The Instant Litigation

Mitsubishi timely filed suit in this court on February 6, 2013.  ECF No. 1.  The court

granted Terphane status as defendant-intervenor on February 13, 2013.  ECF No. 11.  Mitsubishi

in its complaint alleges four counts:  that the Terphane Scope Ruling contradicts the plain language

of the Order, and is therefore contrary to law; that Commerce's determination that Terphane's

films are not dispositively in-scope under 19 C.F.R. § 351.225(k)(1) is unsupported by substantial

evidence; that Commerce's determination that Terphane's films are dispositively out-of-scope

under 19 C.F.R. § 351.225(k)(1) is unsupported by substantial evidence; and that Commerce's

273-day delay in issuing the Terphane Scope Ruling invalidates it and renders it contrary to law.

Pl.'s Compl. ¶¶ 11–27; Pl.'s Br. at 3–4.

Mitsubishi filed its Rule 56.2 motion for judgment on the agency record and accompanying

memorandum in support on August 2, 2013.  Pl.'s Br.  The United States and Terphane filed their

responses on December 4, 2013.  Def.'s Opp'n; Def.-Inter.'s Opp'n.  Mitsubishi filed its reply on

February 3, 2014.  Pl.'s Reply.

Oral argument was held before the court on June 26, 2014.  ECF No. 56.  The court issued

a letter requesting supplemental briefing on a discrete issue highlighted by Mitsubishi toward the

end of argument, specifically, how to correctly read from the scope language the phrase "have

had" in conjunction with the word "modified."  Letter to Parties, Aug. 25, 2014, ECF No. 60.  All

parties filed their supplemental briefs on November 5, 2014.  Def.'s Suppl. Br., ECF No. 66; Def.-

Inter.'s Suppl. Br., ECF No. 68; Pl.'s Suppl. Br., ECF No. 69.  The United States filed its response

to Mitsubishi's supplemental brief on December 11, 2014.  Def.'s Suppl. Opp'n, ECF No. 77.

Terphane filed its response to the same on December 12, 2014.  Def.-Inter.'s Suppl. Opp'n, ECF

No. 78.  Mitsubishi also filed its response to The United States' and Terphane's Supplemental

Briefs on December 12, 2014.  Pl.'s Suppl. Reply, ECF No. 79.

On March 20, 2017, the case was reassigned.  Order of Reassignment, ECF No. 89.  Oral

argument was held before the new judge on May 9, 2017.  ECF No. 99.

## DISCUSSION

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (2012), and 19

U.S.C. § 1516a(a)(2)(A)(ii).

The Court will uphold Commerce's determination unless the <u>Terphane Scope Ruling</u> is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i); <u>Fedmet</u>, 755 F.3d at 918.

On legal issues, the Court affords significant deference to Commerce's interpretation of its

own orders, mindful that scope determinations are "highly fact-intensive and case-specific."

<u>Fedmet</u>, 755 F.3d at 918 (quoting <u>King Supply</u>, 674 F.3d at 1345).  Indeed, Commerce "enjoys

substantial freedom to interpret and clarify its antidumping duty orders.  But while it may interpret

those orders, it may not change them."  <u>Mid Continent Nail Corp. v. United States</u>, 725 F.3d 1295,

1300 (Fed. Cir. 2013) (quoting <u>Ericsson GE Mobile Commc'ns, Inc. v. United States</u>, 60 F.3d 778,

782 (Fed. Cir. 1995), <u>as corrected on reh'g</u> (Sept. 1, 1995)).  Put another way, "orders may be

interpreted as including subject merchandise only if they contain language that specifically

includes the subject merchandise or may be reasonably interpreted to include it."  <u>Id.</u> (quoting

Duferco Steel, 296 F.3d at 1089).   Thus, despite this Court's deference to Commerce's interpretation of its orders, "the question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." Meridian Prod., 851 F.3d at 1382.

On factual issues, "[s]ubstantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support the conclusion reached." Sango, 484 F.3d at 1378 (citing Consol. Edison v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)).   "The specific factual findings on which [Commerce] relies in applying its interpretation are conclusive unless unsupported by substantial evidence." United States v. Eurodif S.A., 555 U.S. 305, 316 n.6 (2009) (citing 5 U.S.C. § 706(2)(E)).   However, that two different conclusions may be drawn from the same evidence does not preclude Commerce's factual determinations from being supported by substantial evidence. Viet I–Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).   At the same time, Commerce's analysis must reasonably demonstrate a connection between the facts in the record and the conclusions drawn. See Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951).   In summary, "the substantial evidence standard requires review of the entire administrative record" and asks, in light of that evidence, whether Commerce's determination was reasonable. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## I.    The Scope of the Order is Ambiguous

In interpreting the scope of an order, the language therein is paramount. Fedmet, 755 F.3d at 918.   The court concludes that the Order's scope language does not on its face demand an

unambiguous reading vis-à-vis the instant matter, but rather is subject to multiple reasonable interpretations. The court thus holds that Commerce has met the requisite low threshold to warrant finding ambiguity and proceeding to an analysis under the 19 C.F.R. § 351.225(k)(1) factors. See Meridian Prod., 851 F.3d at 1381 n.6.

### A. Parties' Arguments

Mitsubishi argues that the Order's scope language unambiguously encompasses Terphane's Copolymer Surface Films, and thus Commerce's subsequent analysis under 19 C.F.R. § 351.225(k)(1) was unlawful. Pl.'s Br. at 22–24. In particular, Mitsubishi emphasizes that the first sentence of the Order covers "all gauges of raw, pre-treated, or primed PET film, whether extruded or co-extruded," and argues that the final clause—"whether extruded or co-extruded"— indicates that co-extrusion cannot produce the necessary performance-enhancing layer necessary to implicate the second sentence's exclusion. Id. Mitsubishi adds that the subsequent exclusions do not have specific "carve-outs for certain subsets of co-extruded films," and Commerce's determination thereby impermissibly alters the terms of the scope language. Id. at 22–23. Further, Mitsubishi argues that the second sentence's mention of "performance-enhancing resinous or inorganic layer" plainly refers to post-extrusion coating, and not to co-extrusion. Id. at 24.

The Government counters that the first sentence "defines the universe of products that are subject to the scope," while the subsequent three sentences "provide explicit exclusions from the universe." Def.'s Opp'n at 10–11. The Government takes issue with Mitsubishi's belief that the "performance-enhancing resinous or inorganic layer" of sufficient thickness to qualify for the exclusion must be applied using a process other than co-extrusion because the Order's plain language specifies no particular process for application of that layer. Def.'s Opp'n at 11–12; Pl.'s Br. at 24. The Government argues that the language is at most ambiguous. Def.'s Opp'n at 12.

In reply, Mitsubishi contends that the second sentence does in fact specify a production

process:  the exclusion covers only "metallized films and other finished films," which necessarily

excludes co-extruded PET film lacking additional processing, because "'finished' indicates that

films covered by the second sentence have undergone some manufacturing process other than the

first stage – i.e. extrusion/coextrusion."  Pl.'s Reply at 7.  Mitsubishi argues that the phrasing must

mean "finished" refers to processes, like metallization, that occur post-extrusion.  Id.  Mitsubishi

also raises for the first time in its reply the argument that the language "finished" and "modified"

in the scope's second sentence introduce a temporal qualification to the exclusion, to wit, that to

come under the exception a PET film must be extruded before the protective-layer of sufficient

thickness is applied, rendering the scope unambiguous.[15]  Id. at 5–13.

---

[15] Mitsubishi's reply focuses on these phrases, yet at oral argument, the court pressed parties on the same point in regards to the phrase "have had."  As noted supra, following oral argument, the court requested supplemental briefing on this singular point, resulting in six supplemental briefs. Assuming arguendo that novel arguments in the supplemental briefs as to scope language are not barred for lack of administrative exhaustion by virtue of the pure legal argument exception, the court summarizes them.

The Government argues that this scope language "describe[s] products at the time of import," rather than identifies a narrower chronological production requirement.  Def.'s Suppl. Br. at 8–9; Def.'s Suppl. Opp'n at 3–6.  The Government supports its reading with a grammatical analysis that, in summary, depicts "have had" and "modified" as implicating only the past tense.

Def.'s Suppl. Br. at 9–10; Def.'s Suppl. Opp'n at 4–6.  Terphane expands this argument, inviting the court to engage in a lengthy and fairly technical exploration of the present perfect tense.  Def.-Inter.'s Suppl. Br. at 5–14; Def-Inter.'s Suppl. Opp'n at 2–4.

In addition to its interpretation of the second sentence of the scope as imposing a temporal requirement, Mitsubishi argues that the Government's and Terphane's proposed interpretation renders much of the phraseology in the second sentence surplusage:  "that have had at least one of their surfaces modified by the application of"; "finished"; and "had."  Pl. Suppl. Br. at 8; see Polites v. United States, 35 CIT ___, ___, 755 F. Supp. 2d 1352, 1357 (2011) ("[Commerce] may not render parts of the Order 'mere surplusage.'" (citing Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1073 (Fed. Cir. 2001))).

The Government reiterates that the scope language is at most ambiguous, satisfying the threshold requirement for a deeper inquiry under 19 C.F.R. § 351.225(k)(1), and that the tense styling in the second sentence can be plainly read to reference a process occurring at any time prior to import. Def.'s Suppl. Opp'n at 4–5.  The potentially superfluous language that Mitsubishi alleges the Government's reading would create is instead grammatically and colloquially acceptable,

### B. Analysis

The scope language in the Order is ambiguous such that Commerce' decision to perform an analysis under 19 C.F.R. § 351.225(k)(1) was warranted.   Accepting that a co-extruded layer may implicate the exclusion in the second sentence does not necessarily render superfluous the phrase "whether extruded or co-extruded" in the first sentence, as Mitsubishi contends.   The second sentence simply does not specify the production process that must be used to provide the sort of layer that results in a product's exclusion.   Indeed, "whether extruded or co-extruded" may plainly be read to indicate that the mere fact of co-extrusion does not save a PET film product from falling under the Order.   It is not incumbent upon Commerce or this court to read the phrase as meaning that, absent a carve-out mentioning co-extrusion, a co-extruded PET film cannot possibly also qualify for the exclusion under the second sentence unless an additional protective resinous or inorganic coating or layer of sufficient thickness were applied to the extruded PET film through a manner other than co-extrusion.   Nothing in the scope demands that reading.

Mitsubishi also cannot identify language that would command an unambiguous reading of the scope with the temporal restraints they identify, such that the second sentence exclusion covers only "films with post-extrusion coatings." Pl.'s Suppl. Br. at 7.   In regard to Mitsubishi's argument that Commerce's reading of the second sentence creates surplusage, the court is satisfied that Commerce and the defendant articulate plausible readings of the allegedly superfluous language

---

maintains defendant, and was reasonably interpreted by Commerce below.  Def.'s Suppl. Opp'n at 5–8.  Terphane argues that the scope language does not beckon for an exclusion based on a particular manufacturing process, and that Mitsubishi's construction relies on arbitrary perspectives not compelled by a plain reading. Def.-Inter.'s Suppl. Opp'n at 2–4.  Terphane then argues that Mitsubishi's reading is not mandated by any of the scope language, which is instead ambiguous.  Def.-Inter.'s Suppl. Opp'n at 5–11.  Mitsubishi reiterates much of its plain reading and surplusage arguments in its own supplemental reply brief.  Pl.'s Suppl. Reply at 1–12.

such that they are useful descriptors.  See Scope Ruling at 12; Def.'s Suppl. Opp'n at 5–8.  To read

the second sentence as Mitsubishi would like the court to would instill overly narrow meaning to

otherwise broad language.   See 19 C.F.R. § 351.225(a) (stating that descriptions of subject

merchandise "must be written in general terms"); see also Mid Continent Nail, 725 F.3d at 1305

("Commerce enjoys considerable discretion in interpreting its own orders.").   No language in the

scope commands that a "finished film" must "have had" one of its "surfaces" "modified by the

application of" a protective resinous or inorganic layer of sufficient thickness in a specific

chronology, other than, necessarily, prior to import.[16] [17]

---

[16] Mitsubishi's reading of "finished films" may be plausible, but it is not unambiguous.   As
evidenced by the parties' conflicting interpretations of the word in context, "finished" is
ambiguous.   Even if it were unambiguous, it would remain plausible to read the second sentence
as meaning that films can become "metallized [or] . . . finished" after they have had one of their
surfaces modified by the application of a performance-enhancing resinous or inorganic layer of
sufficient thickness.   See Pl.'s Suppl. Br. at 6.   Further one could read "surfaces" as being
"modified" at the time of co-extrusion, since there is no unambiguous language providing that a
"surface" necessarily does not exist at the moment of extrusion or co-extrusion.   See id.

[17] In its supplemental brief, the Government argues that Mitsubishi failed to exhaust its
administrative remedies before Commerce with respect to the argument that the words "have had"
in the scope language indicate that the exclusionary language does not apply to co-extruded films.
Def.'s Suppl. Br. at 5–7.   The Government's argument is unpersuasive in several respects.
Although "[t]he exhaustion doctrine requires a party to present its claims to the relevant
administrative agency for the agency's consideration before raising these claims to the Court[,]"
Shandong Huarong Mach. Co., Ltd. v. United States, 30 CIT 1269, 1305, 435 F. Supp. 2d 1261,
1292 (2006) (internal citations omitted), and "the court tends to take a strict stance on exhaustion,
the requirement that a party exhaust its administrative remedies has been excused in trade cases
'where . . . the issue involves a pure question of law not requiring further factual development.'"
Meridian Prod., LLC v. United States, 39 CIT ___, ___, 77 F. Supp. 3d 1307, 1312 (2015) (quoting
SeAH Steel Corp. v. United States, 35 CIT ___, ___, 764 F. Supp. 2d 1322, 1325–26 (2011)).   To
establish the pure question of law exception the following requirements must be met:

> (a) . . . plaintiff shall raise a new argument; (b) this argument shall
> be of purely legal nature; (c) the inquiry shall require neither further
> agency involvement nor additional fact finding or opening up the
> record; and (d) the inquiry shall neither create undue delay nor cause
> expenditure of scarce party time and resources.

Though Mitsubishi's construction of the plain scope language is not unreasonable, it is also

not unambiguous.  While "Commerce need only meet a low threshold to show that it justifiably

found an ambiguity in scope language," Allegheny Bradford Corp. v. United States, 28 CIT 830,

843, 342 F. Supp. 2d 1172, 1184 (2004) (citing Novosteel SA v. U.S., Bethlehem Steel Corp., 284

F.3d 1261, 1272 (Fed. Cir. 2002)), Mitsubishi points out that "it is not justifiable to identify an

ambiguity where none exists," as doing so would result in an interpretation that impermissibly

conflicts with an order's terms and alters its scope.  Pl.'s Br. at 24 (citing Laminated Woven Sacks

Comm. v. United States, 34 CIT 906, 914, 716 F. Supp. 2d 1316, 1325 (2010)).  Here, the parties'

conflicting readings of the scope language, permeating the four initial briefs and all six

supplemental briefs, indicate that the scope language is subject to reasonable interpretation.[18]  See

Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 40 CIT ___, ___, 146 F. Supp. 3d

---

Consolidated Bearings Co. v. United States, 25 CIT 546, 553–54, 166 F. Supp. 2d 580, 587 (2001),
rev'd on other grounds, 348 F.3d 997 (Fed. Cir. 2003).  Here, Mitsubishi's argument regarding the
"have had" language fits into its prior arguments regarding processes and how the scope language
should be read.  See supra Section I.  However, even assuming arguendo that Mitsubishi's
argument did not fit within its prior arguments and that Mitsubishi had failed to exhaust its
administrative remedies, the pure question of law exception applies.  See Consolidated Bearings
Co., 25 CIT at 553–54.  In the instant case, Mitsubishi raises a new argument of purely legal nature
(the proper reading and interpretation of scope language); no further agency involvement,
additional fact finding, or opening up the record are necessary; and the inquiry will not create
undue delay nor cause expenditure of scarce party time and resources.  See id.; see also Meridian
Prod., 77 F. Supp. 3d at 1313 (finding that the language of the scope itself can present a pure
question of law).  Thus, the pure question of law exception to exhaustion is applicable.

[18] The court recognizes that the Government might have made an argument that the scope language
is unambiguous in the manner they might read it:  that the language plainly means that co-extrusion
can provide the "performance-enhancing resinous or inorganic layer more than 0.00001 inches
thick" of the second sentence exclusion because nothing in the language explicitly decrees that co-
extrusion may not provide that layer.  However, the defendant did not make that argument.
Compare SEC v. Chenery Corp., 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be
upheld unless the grounds upon which the agency acted in exercising its powers were those upon
which its action can be sustained.").  In any event, this plausible interpretation, juxtaposed with
Mitsubishi's, supports Commerce's determination that the language is ambiguous.

1331, 1336 n.27 (2016) (citing Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1383 (Fed.

Cir. 2005) ("[A] predicate for the interpretive process is language in the order that is subject to

interpretation.")); Laminated Woven Sacks, 716 F. Supp. 2d at 1326 ("All that is necessary before

Commerce may consider secondary documents from the original investigation is 'language in the

order that is subject to interpretation.'" (quoting Duferco Steel, 296 F.3d at 1097)).  The ambiguity

does not plainly conflict with the Order's terms.  In short, Commerce therefore acted in accordance

with law when it proceeded to analyze the scope under the factors provided by 19 C.F.R. §

351.225(k)(1).

## II.     Commerce's Analysis Under 19 C.F.R. § 351.225(k)(1) was Unsupported by Substantial Evidence

Having affirmed Commerce's determination regarding ambiguity, the court must now

consider Commerce's finding that the factors in 19 C.F.R. § 351.225(k)(1) dispositively place

Terphane's Copolymer Surface Products outside of the scope of the Order.  Ultimately the court

concludes that it cannot be said with reasonable confidence that Commerce's analysis and

determination under (k)(1) was supported by substantial evidence.  As mentioned supra an analysis

under 19 C.F.R. § 351.225(k)(1) involves "the descriptions of the merchandise contained in the

petition, the initial investigation, and the determinations of the Secretary (including prior scope

determinations) and the Commission."  "Commerce's analysis of these sources against the product

in question produces factual findings reviewed for substantial evidence."  Meridian Prod., 851

F.3d at 1382. Here, the agency did not come to a reasonable conclusion in consideration of the

entire administrative record, specifically in regards to relevant "descriptions of the merchandise

contained in the petition [and] the initial investigation" such that its findings under the other (k)(1)

factors "definitively answer the scope question."  Id. at 1382 n.8; see Nippon Steel, 458 F.3d at

1351; Universal Camera, 340 U.S. at 488 ("The substantiality of the evidence must take into

account whatever in the record fairly detracts from its weight.").

## A. Parties' Arguments

Mitsubishi asserts that (k)(1) evidence could reasonably indicate only that Terphane's films

are dispositively in-scope, and thus the agency's determination that the (k)(1) criteria do not

indicate dispositively that Terphane's films are in-scope is unsupported by substantial evidence.[19]

Pl.'s Br. at 24–30.  Mitsubishi argues Commerce ignored that throughout the history of the Order

and previous antidumping duty orders on PET film, petitioners, Commerce, the ITC, and

respondents "have always regarded coextruded films . . . as being in-scope," while "[n]o interested

party or government agency" has indicated that they might be out-of-scope "depending on the

thickness of the coextruded layer." Id. at 26.  Further, Mitsubishi argues that analyses within

elements of (k)(1) evidence demonstrate a pattern of association between equivalent PET films

and their possible exclusion under the second sentence, but nowhere display the same in regards

to co-extruded films, or suggest that co-extruded films might qualify as equivalent PET films

depending on the thickness of a co-extruded layer.  Id. at 27.  Mitsubishi also takes issue with

Commerce's failure to mention, address, or engage with Terphane's questionnaire responses from

the original investigation, in which Terphane stated its belief that its co-extruded products were

in-scope, and the original Petition, in which plaintiffs (as petitioners) "complained about lost sales

due to a Terphane film that was functionally similar" to the films at issue in this case.  Id. at 26–

---

[19] In the alternative, Mitsubishi presents its argument in the negative:  Commerce's "further finding"—that the (k)(1) evidence indicates dispositively that Terphane's films are out-of-scope, provided that the layer in question is sufficiently thick—is unsupported by substantial evidence, because it "has no support in the history of antidumping duty orders on PET film." Pl.'s Br. at 30.

28.   Altogether, these analytical choices strike Mitsubishi as a failure to explain how (k)(1)

evidence does not show dispositively that Terphane's films are in-scope.

Mitsubishi also characterizes Commerce's determination as relying on the mistaken

determination that Cronar and Estar, which are equivalent PET films, are in fact co-extruded.  Pl.'s

Br. at 28–29.  Mitsubishi adds that besides this misclassified evidence, Commerce neither cited

any potentially dispositive evidence related to the (k)(1) factors nor indicated that either Avery

Dennison or Garware scope determinations are controlling in this case, as neither involved a co-

extruded film.  Id. at 29.

The Government and Terphane respond first that Mitsubishi—by identifying pieces of the

record where equivalent PET is spoken of as excluded from the scope while co-extrusion is not—

misunderstands the regulatory requirement, which is that Commerce under 19 C.F.R. §

351.225(k)(1) assesses "descriptions of the merchandise" contained in the enumerated sources.

Def.'s Opp'n at 6, 13.  Rather, the scope defined in the Petition, identical to the scope in the Order,

was silent on the question of whether the "performance-enhancing resinous or inorganic layer"

must be applied through any particular process.  Def.'s Opp'n at 13.  Second, the Government and

Terphane argue Mitsubishi misinterprets the relevance of the original investigation and two prior

scope rulings in the same manner.  Def.'s Opp'n at 14.  They point out that the two prior scope

determinations—Garware and Avery Dennison—likewise implicate the description of the

merchandise, as the analyses therein considered the two critical factors identified above:  the

presence of a performance-enhancing layer, and the thickness of that layer.[20]  Def.'s Opp'n at 14.

---

[20] The Government and Terphane contend that Garware spoke to the performance-enhancing
quality of the layer in question, while Avery Dennison spoke to thickness of the layer in question;
in their view, contrary to Mitsubishi's arguments, neither the chemical composition of the layer,
nor the production method used to apply it, had any bearing upon Commerce's determinations in
both instances.  Def.'s Opp'n at 14; Def-Inter.'s Opp'n at 24–27; Scope Ruling at 13.

As to Mitsubishi's argument that Commerce failed to address questionnaire responses, the Government reiterates that 19 C.F.R. § 351.225(k)(1) directs the agency to analyze "descriptions of the merchandise" in the original investigation.   Finally, in response to Mitsubishi's characterization of Commerce's analysis as hinging on a mistaken determination that Cronar and Estar are co-extruded—a factual error now acknowledged by Commerce in its briefing to the court—the Government and Terphane emphasize once more that the relevance of those ITC determinations is in the physical description of Cronar and Estar therein.[21]  Def.'s Opp'n at 7, 17–18; Def.-Inter.'s Opp'n at 21–24.

Mitsubishi replies that Avery Dennison and Garware are merely "consistent," rather than "controlling" or "dispositive," and asserts that "[m]uch of Defendant and Defendant-Intervenor's arguments" are post-hoc rationalizations.  Pl.'s Reply at 14–15; see Burlington Truck Lines, 371 U.S. at 168–69; see also Nan Ya Plastics Corp., Ltd. v. United States, 37 CIT ___, ___, 906 F. Supp. 2d 1348, 1354 (2013).  Mitsubishi adds that the Government fails to identify any relevant discussion of "descriptions of the merchandise" in the "Analysis" section of Commerce's determination; that defendant makes a logical error by relying on consistency of the scope language to come to a dispositive (k)(1) conclusion, yet finding that same language ambiguous at the preliminary stage of analysis; and that defendant is wrong to defend Commerce's failure to address the aforementioned questionnaire responses, because they constitute part of the relevant (k)(1)

---

[21] That these products are equivalent PET, which indisputably comes under the second sentence exception, does not detract from their relevance to Terphane's case, the Government argues, because Terphane's products share several physical characteristics with Cronar and Estar such that they all seem to fulfil the exclusion for the same reasons.  Namely, all are designed for further manufacturing, are adhesive and receptive to further coating, and all possess performance-enhancing layers that provide them with additional capabilities not found in raw PET film or mere primed or pretreated PET film.  Def.'s Opp'n at 17–18; Def.-Inter.'s Opp'n at 21–24.

evidence insofar as they are "descriptions of the merchandise contained in . . . the initial investigation[ ]." Pl.'s Reply at 16–17.

As to Terphane's points, Mitsubishi responds that it failed to identify how exactly the performance-enhancing characteristics of Cronar and Estar are sufficiently similar to Terphane's Copolymer Surface Films such that the latter should be excluded for the same reasons as the former.[22] Pl.'s Reply at 18.

### B. Analysis

The court concludes that Commerce did not analyze the "descriptions of the merchandise contained in the petition, [and] the original investigation" on the record, including those that fairly detract from its determination, see Universal Camera, 340 U.S. at 488, such that its entire analysis dispositively answers the scope question in accordance with the substantial evidence standard. 19 C.F.R. § 351.225(k)(1). While the Petition and original antidumping investigation are cited at points during the Terphane Scope Ruling, it is to the purpose of summarizing parties' arguments;[23] nowhere in the "Analysis and Conclusions" section do they appear. Compare Scope Ruling at 6 ("Petitioners argue that they intended for these films to fall within the scope of The Order . . . Terphane argues that, on the contrary, Petitioners never claimed during the investigation that Terphane should have included these films, despite Terphane indicating it made such films.") with Scope Ruling at 11–14 ("Analysis and Conclusions").

---

[22] Mitsubishi further characterizes the Scope Ruling as a finding that Terphane's films are equivalent PET films. Pl.'s Reply at 19. This alleged finding, Mitsubishi argues, lacks support. Id.

[23] Commerce twice cites the Petition at 85 to contextualize parties' arguments before the agency. Scope Ruling at 6 nn.39–40.

"In making a scope determination, Commerce must 'utilize[ ] and abide[ ] by the statutory and regulatory provisions that authorize [it] to investigate [scope issues].'" Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 40 CIT ___, ___, 181 F. Supp. 3d 1348, 1356 n.15 (2016) (quoting AMS Associates, Inc. v. United States, 737 F.3d 1338, 1344 (Fed. Cir. 2013)). Individual pieces of (k)(1) evidence together depict the regulatory history of a type of merchandise such that Commerce may informedly determine whether the scope covers the products under review. Mid Continent Nail, 725 F.3d at 1302 ("If the [scope] language is ambiguous, Commerce must next consider the regulatory history, as contained in the [ ] '(k)(1) materials.'") (citations omitted). This Court has held that "[t]his includes an informed and meaningful assessment of the Petition." Shenyang, 181 F. Supp. 3d at 1356. Failure to meaningfully consider the (k)(1) factors makes remand appropriate. Id.; see Mid Continent Nail Corp. v. United States, 35 CIT ___, ___, 770 F. Supp. 2d 1372, 1379 (2011) (citing Allegheny Ludlum Corp. v. United States, 24 CIT 452, 479, 112 F. Supp. 2d 1141, 1165 (2000) ("[I]t is . . . well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence.")).

The Government asserts that Mitsubishi "fundamentally misunderstand[s] Commerce's interpretive process as defined by its regulations," which is "that 'descriptions of the merchandise' are the most probative and meaningful evidence to resolve scope issues under 19 C.F.R. § 351.225(k)(1)." Def.'s Opp'n at 15. The court understands this to mean that the Government perceives Mitsubishi's argument as calling for Commerce to consider, as probative, what the parties believed were in scope at the time of, and as shown by, the Petition and original investigation. Id. ("Petitioners contend that Commerce failed to address certain questionnaire

responses from the original investigation, in which Terphane stated its belief that its co-extruded

films were in-scope and in which petitioners 'complained about lost sales due to a Terphane film

that was functionally similar' to the films at issue . . . ."). This perspective is not elucidated in the

Scope Ruling, and so constitutes a post-hoc rationalization for a sizable gap in the agency's

analysis. See Motor Vehicle Mfrs. Ass'n of United States, 463 U.S. at 43 (quoting Burlington

Truck Lines, 371 U.S. at 168).

Regardless, Commerce nowhere justified its avoidance of the Petition and original

investigation under its (k)(1) analysis, despite that they contain "descriptions of the merchandise"

that Commerce is obligated to analyze thereunder. [24] Scope Ruling; 19 C.F.R. § 351.225(k)(1).

Mitsubishi further invokes certain (k)(1) materials as expressing their intent at the time they filed

the Petition and participated in the original investigation as petitioners. Pl.'s Br. at 26 (citing

Petition at 10). The Government may characterize this citation as one to petitioners' belief at the

time of filing the Petition, but it is patently a "description[ ] of the merchandise" contained in the

---

[24] Mitsubishi, in describing the relevant (k)(1) evidence that it argues Commerce did not
sufficiently engage with, points to the Petition, quoting, inter alia, petitioners' description that
"PET film can be made with a single layer or can be coextruded with other polymers into a
multilayer film" and that "the proposed domestic like product in this investigation excludes
'equivalent' PET film, i.e., PET film with a coating of more than 0.00001 inch thick." Pl.'s Br. at
9–10 (citing Petition at 9–11). As to elements of the original investigation, Mitsubishi points to a
letter petitioners sent to Commerce wherein they urged the agency to account for co-extruded films
in its calculations of normal value, Pl.'s Br. at 10–11 (citing Pets' QR at Ex. 8, pp. 2–3); Section
A, B, and D questionnaire responses wherein Terphane described PET film products, Id. at 11–13
(citing Pets' QR at Ex. 4, 6, 11); and the ITC's report from the initial investigation, wherein the
definition of "equivalent PET film" was discussed, Id. at 13–15 (citing Pets' QR at Ex. 17). See
Pl.'s Br. at 26–28 (describing additional citations to the Petition and original investigation that
Mitsubishi argues are relevant). The court does not determine that Mitsubishi's citations to the
Petition and the original investigation comprise an authoritative or exhaustive list of relevant (k)(1)
evidence that should affect Commerce's determination, but merely that where there is a description
of the merchandise in those sources that may affect the outcome, Commerce should consider it,
and explain its reasoning.

Petition.  Commerce does not analyze, rebut, or otherwise consider these elements of the record

under the Scope Ruling's Analysis and Conclusions section.  Scope Ruling at 11–14.  In light of

ambiguous scope language, Commerce should give consideration to petitioners' intended meaning

when examining a petition's description of the subject merchandise.[25]  See Mid Continent Nail,

770 F. Supp. 2d at 1379 ("Commerce failed to address the Petitioners' Scope Letter which made

clear the Petitioners' intention that their proposed scope language would include subject goods

packaged with non-subject items. This failure alone renders the Final Scope Ruling unsupported

by substantial evidence."); see also Fedmet, 755 F.3d at 921 ("[T]he reason why the (k)(1) sources

are afforded primacy in the scope analysis is because interpretation of the language used in the

orders must be based on the meaning given to that language during the underlying

investigations.").

    These materials may not be dispositive in either direction under a reasoned analysis, but

they merit consideration.  See Nippon Steel, 458 F.3d at 1351; Universal Camera, 340 U.S. at 488;

Nan Ya Plastics Corp., Ltd. v. United States, 39 CIT ___, ___, 128 F. Supp. 3d 1345, 1355 (2015)

_____

[25] At the second oral argument, counsel for the Government stated that Commerce did in fact defer
to petitioners' intent in crafting the scope language—specifically in that petitioners intended for
the scope language to be recycled from the earlier ITC proceedings described supra.  The court
notes that this articulation of petitioners' intent does not quite capture the intent that would be
more relevant to the agency's analysis, which is what the petitioners intended the scope language
would mean in context.  That notwithstanding, the court is sensitive to the reality that petitioners'
subjective intent should yield to express language in the scope, to the extent they conflict. See
ArcelorMittal, 694 F.3d at 90 ("Commerce is not at liberty to ignore the plain terms of an order in
what appears to be, in retrospect, an effort to better reflect the intent of the petitioners."); Duferco
Steel, Inc. v. United States, 25 CIT 493, 501, 146 F. Supp. 2d 913, 922 (2001) (noting that while
"this Court has previously held that Commerce must give ample deference to the petitioner's intent
when examining a petition's description of the subject merchandise," the Court should "avoid
subjective issues of intent and, instead, look to the petition's language to determine whether the
class or kind of merchandise at issue was expressly included"), rev'd on other grounds, 296 F.3d
1087 (Fed. Cir. 2002).

(quoting <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994)).  The court expresses no inclination as to the correct outcome, but concludes that Commerce must explain how its findings were "reached by 'reasoned decision-making,' including . . . a reasoned explanation supported by a stated connection between the facts and the choice made." <u>Elec. Consumers Res. Council v. Fed. Energy Regulatory Comm'n</u>, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (citing <u>Burlington Truck Lines</u>, 371 U.S. at 168; <u>Memphis Light, Gas and Water Div. v. FPC</u>, 504 F.2d 225, 230 (D.C. Cir. 1974)).  Altogether, Commerce must provide further explanation for its decisions in regard to relevant (k)(1) materials in the record, including those in the <u>Petition</u> and original investigation which it did not analyze in the original determination, on remand.

Because the original determination will be a focus of the remand proceeding, with respect to that original determination, the court also notes that it disagrees with Mitsubishi's contention that Commerce's misclassification of Cronar and Estar as co-extruded products was central to the <u>Terphane Scope Ruling</u>. <u>See e.g.</u> Pl.'s Br. at 28–29.  Instead, the court agrees with the Government that the "descriptions of the merchandise" in those ITC determinations, which share language with the <u>Order</u>'s scope, should be relevant to the analysis of products in the instant case.  Def.'s Opp'n at 15–18.[26]  Bedeviling Commerce, however, is its explanation that the second sentence exclusion "refers to a specific category of products which the ITC identified as 'equivalent PET film,'" defined by the ITC as "including DuPont's Cronar and Estar products, and those products

---

[26] The Government notes that Terphane actually provided evidence that Estar is produced through an in-line process.  Def.'s Opp'n at 17 n.5 (citing <u>Terphane's May 7 Comments</u> at 8–11; <u>Terphane's June 7 Response</u> at 7).  While "[c]o-extrusion is a type of in-line process . . . there is no record evidence that the in-line process used to manufacture Estar is co-extrusion." <u>Id.</u>  Counsel for the Government reiterated this point at oral argument.

equivalent to Cronar and Estar,"[27] in conjunction with its later statement that Cronar and Estar "are the paradigmatic examples of films" covered by the exclusion.  Scope Ruling at 4, 12.  A reasonable mind would understand these categorical statements to mean that, in order to qualify for the exclusion, Terphane's Copolymer Surface Films must also be equivalent PET films, or "equivalent to Cronar and Estar."[28]  Read together with Commerce's mistaken belief that Terphane had provided evidence "that indicates that Cronar and Estar are co-extruded," see Def.'s Opp'n at 17,  they necessitate a finding that at least some co-extruded films, namely Cronar, Estar, and Terphane's Copolymer Products, are also equivalent PET films, and vice versa.  However, in light of Commerce's mistake, it is unclear the extent to which Commerce's identification of the second sentence exclusion specifically with equivalent PET film influences the overall determination that Terphane's Copolymer Surface Films are dispositively out of scope.  The Government points to the physical similarities between Terphane's Copolymer Products, Cronar, and Estar, and reiterates that "the specific process used to apply the performance-enhancing layer has no bearing upon whether the exclusion at issue applies."   Def.'s Opp'n at 18.  But if the second sentence exclusion applies only to equivalent PET films, then Commerce would also need to determine that Terphane's Copolymer Products are equivalent PET films in order to exclude them under the second sentence; or, if Commerce does not make that determination, then to reach the same conclusion, it would need to explain how the second sentence exclusion can apply to PET films that are not equivalent.  Perhaps this is what Commerce means when it refers to those films

---

[27] Commerce supported this statement with information submitted by parties into the administrative record.  Scope Ruling at 4 n.25 (citing Terphane's Scope Ruling Request at 5; Pets' Mar. 23 Comments at 3).

[28] Terphane argued before the agency, and argues before this court, that its Copolymer Surface Films are equivalent PET.  Terphane Scope Ruling Request at 5; Def.-Inter.'s Opp'n at 20.

"identical to" or "equivalent to" Cronar and Estar.  Scope Ruling at 4, 12.  However, it is unclear

to the court what films would be identical to Cronar and Estar without themselves being equivalent

PET, and whether there is a meaningful difference between those categories.  Commerce should

also clarify whether equivalent PET refers solely to those films excluded under the second sentence

exclusion, or one that is a term of art in the industry. [29]   See ArcelorMittal, 694 F.3d at 88

("[A]ntidumping orders should not be interpreted in a vacuum devoid of any consideration of the

way the language of the order is used in the relevant industry.").  Commerce must reconcile these

inconsistencies on remand and more clearly explain its reasoning without the assistance of post-

hoc explanations from counsel.  See Changzhou Wujin Fine Chem. Factory Co. v. United States,

701 F.3d 1367, 1377 (Fed. Cir. 2012) ("The grounds upon which an administrative order must be

judged are those upon which the record discloses that its action was based." (quoting Chenery, 318

U.S. at 87)).

In sum, to stand, the Scope Ruling must demonstrate, based on substantial evidence on the

record, that Commerce's conclusion that its (k)(1) analysis was dispositive of the scope question.

See Meridian Prod., 851 F.3d at 1382 n.8.  That it does not do, for the reasons laid out above.  On

remand, Commerce shall consider the (k)(1) evidence contained in the agency record that is

derived from the Petition and the original investigation, per the regulation.  The court reiterates

that in this opinion it expresses no inclination as to the determination Commerce should make, but

---

[29] Mitsubishi points to the ITC's report from the original investigation, which notes, inter alia, that "the Commission has defined equivalent PET film as PET film to which has been applied a coating of more than 0.0001 inch thick," in support of its contention that "the ITC found that equivalent PET films do not compete with subject PET films . . . [t]his discussion of equivalent PET film did not refer to coextruded films . . . ."  Pl.'s Br. at 14–15 (citing Pets' QR at Ex. 17, pp. I-13–I-14). Mitsubishi also takes issue with Commerce's association between co-extruded films and equivalent PET.  Pl.'s Br. at 27 ("[N]o interested party or government agency has ever indicated that coextruded films might qualify as equivalent PET films, depending on the thickness of the coextruded layer.").

only instructs that Commerce must give a reasoned review to the entire record, per the dictates of

its regulation, in the process.  Accordingly, if Commerce determines that the (k)(1) factors are not

dispositive, then it shall consider the factors listed in 19 C.F.R. § 351.225(k)(2) and make a

determination thereunder.  See generally Diversified Products, 572 F. Supp. 883.

## III.   The Terphane Scope Ruling was not Invalidated by Delay

Mitsubishi argues that the Terphane Scope Ruling is invalidated by delay.  Pl.'s Br. at 30.

Mitsubishi points out that Commerce's regulations require it to issue a scope determination within

"45 days of the date of receipt of an application for a scope ruling," unless it initiates a scope

inquiry under the Diversified Products criteria.  Id. at 30; 19 C.F.R. § 351.225(c)(2). In the instant

matter, Commerce neither issued a scope determination within 45 days of the receipt of Terphane's

application (submitted February 22, 2012), nor did it initiate a scope inquiry under the Diversified

Products criteria.  Terphane Scope Ruling at 1.  Rather, Commerce issued the Scope Ruling 320

days later on January 7, 2013.  Id.  Mitsubishi argues that Commerce "departed arbitrarily" from

its policy of issuing scope determinations within 45 days, and that therefore, this departure

invalidates the scope determination and renders it contrary to law and unsupported by substantial

evidence.  Pl.'s Br. at 31 (citing Koyo Seiko Co., Ltd. v. United States, 16 CIT 366, 372, 796 F.

Supp. 517, 523 (1992)); see also Amanda Foods (Viet.) Ltd. v. United States, 35 CIT ___, ___,

807 F. Supp. 2d 1332, 1343 (2011) ("When an agency changes its position suddenly and without

explanation or 'does not take account of legitimate reliance on prior interpretation,' the agency's

action may be 'arbitrary, capricious [or] an abuse of discretion.'" (quoting Smiley v. Citibank

(South Dakota), N.A., 517 U.S. 735, 742 (1996))).  Mitsubishi contends that it was harmed by the

delay in that it was "subjected to 273 additional days of unfairly traded Terphane imports."  Pl.'s

Reply at 3–4.

Mitsubishi's arguments miss the mark.  Courts are "most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake."  Brock v. Pierce County, 476 U.S. 253, 260 (1986); see also United States v. Great Am. Ins. Co. of NY, 738 F.3d 1320, 1329 (Fed. Cir. 2013). Commerce may, "for good cause," extend any time limit within Part 351 of Title 19, unless expressly precluded by statute. 19 C.F.R. § 351.302(b) (2012).   In addition, it is within Commerce's discretion "to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."  Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 539 (1970).  Here, Commerce received voluminous submissions (approximately 700 pages) that were highly technical and complex.  Def.'s Opp'n at 4.  Given the size and complexity of the submissions, Commerce had good cause to extend the time limit beyond 45 days.  See 19 C.F.R. § 351.302(b).  While the court need not reach the question of whether the delay here was reasonable, it is telling that that Mitsubishi did not object to the extension.  See Pl.'s App.   In any event, invalidation is not warranted because the time period in § 351.225(c)(2) is directory, not mandatory, as it does not specify a consequence for failure to comply with the provision.  See Canadian Fur Trappers Corp. v. United States, 12 CIT 612, 615, 691 F. Supp. 364, 367 (1988), aff'd, 884 F.2d 563 (Fed. Cir. 1989).  "[A] statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provisions."  United States v. Great Am. Ins. Co. of NY, 35 CIT ___, ___, 791 F. Supp. 2d 1337, 1354 (2011) (quoting id.), aff'd, 738 F.3d 1320 (Fed. Cir. 2013).  Finally, the court's decision to remand this matter moots any issue regarding invalidation by delay, as the new deadlines set by the court will apply going forward.

**CONCLUSION**

For the foregoing reasons, it is hereby

 **ORDERED** that Mitsubishi's motion for judgment on the agency record is granted in part and denied in part; and it is further

 **ORDERED** that Commerce's determination under 19 C.F.R. § 351.225(k)(1) as to Terphane's Copolymer Surface Products is remanded for further consideration consistent with this opinion; and it is further

 **ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

 **ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

 **ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.

         /s/  Gary S. Katzmann
         Gary S. Katzmann, Judge

Dated:  June 8, 2017
    New York, New York