Slip Op. 18-71

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MITSUBISHI POLYESTER FILM, INC. and SKC INC., | |
| Plaintiffs, | |
| v. | Before: Judge Gary S. Katzmann |
| UNITED STATES, | Court No. 13-00062 |
| Defendant, | |
| and | |
| TERPHANE, INC. and TERPHANE, LTDA, | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Commerce's Final Results of Redetermination pursuant to Court Remand Order are sustained.]

Dated: June 19, 2018

<u>Patrick J. McLain</u>, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, DC, argued for plaintiffs. With him on the brief were <u>Ronald I. Meltzer</u> and <u>David M. Horn</u>.

<u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Sonia M. Orfield</u>, Trial Attorney. Of counsel on the brief was <u>Nanda Srikantaiah</u>, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

<u>J. Michael Taylor</u>, King and Spalding LLP, of Washington, DC, argued for defendant-intervenors. With him on the brief was <u>Stephen A. Jones</u>.

Katzmann, Judge: In the college graduation party scene of an oft-referenced 1967 film,

family friend Mr. McGuire famously offers "one word" to Benjamin Braddock, the 21-year old

honoree: "Plastics."[1]  "There's a great future in plastics," he insisted.  "Think about it.  Will you think about it?"  The court in this opinion endeavors to do just that.

Before the court is the United States Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand Order (Dep't Commerce Oct. 20, 2017) ("Remand Results"), ECF Nos. 108–09, which the court had ordered in Mitsubishi Polyester Film, Inc. v. United States, 41 CIT ___, 228 F. Supp. 3d 1359 (2017) ("Mitsubishi I").  Plaintiffs Mitsubishi Polyester Film, Inc. and SKC, Inc. (collectively, "Mitsubishi") contest the Remand Results and seek another remand.  Mitsubishi's Comments ("Pl.'s Br."), Nov. 20, 2017, ECF No. 112.  Defendant the United States, on behalf of Commerce, and Defendant-Intervenors Terphane, Inc. and Terphane, Ltda. (collectively, "Terphane") ask the court to sustain the Remand Results in their entirety.  Government's Reply Comments ("Def.'s Br."), Dec. 15, 2017, ECF No. 113; Terphane's Reply Comments ("Def.-Inter.'s Br."), Dec. 15, 2017, ECF No. 114.  The court sustains the Remand Results in their entirety.

## BACKGROUND

The full background of this case prior to the instant remand proceedings may be found in Mitsubishi I.  That opinion explained the nature of polyethylene terephthalate ("PET") film, which is the family of the products at issue, and summarized its relevant production processes:

> Generally speaking, PET film production begins with the polymerization process, in which the combination of certain chemicals and additives, heated in multiple rounds and then cooled, forms PET pellets or "chips."  The next phase is extrusion.  The PET chips are melted and then squeezed through a die, cooled, heated, and manipulated to a specified length or width.  "Co-extrusion" by contrast involves the simultaneous extrusion of polymer from multiple lines through a single die; in other words, extrusion involves only one stream of polymer, whereas co-extrusion involves multiple streams of polymer that may differ in their chemical makeup and physical properties.  At the time of co-extrusion, these multiple outputs may be stacked or alternated to form a single, layered, co-extruded PET product.  After

---

[1] THE GRADUATE (Mike Nichols/Lawrence Turman Productions 1967).

extrusion or co-extrusion, the molten polymer substance is cooled, and then stretched to form a film.  The PET product may still be altered or treated in some way, such as through the addition of another layer or coating to a side of the PET; this may occur "in-line," as part of the manufacturing process, or "off-line."

Mitsubishi I, 228 F. Supp. 3d at 1362–63.

I.    **Initial Proceedings Before Commerce.**

On September 28, 2007, Mitsubishi, Dupont Teijin Films, and Toray Plastics (America), Inc. ("Petitioners"), filed an antidumping duty petition covering "all PET film imported into the United States from Brazil, China, Thailand and the UAE."  Polyethylene Terephthalate Film, Sheet, and Strip From Brazil, People's Republic of China, Thailand and the United Arab Emirates, Antidumping Duty Petition ("Petition") at 9 (Sept. 28, 2007), in Terphane's Scope Ruling Request Letter ("Scope Ruling Request") at Ex. 23, PD 1–3, CD 1–4 (Feb. 22, 2012); Commerce's Ex Parte Memo Placing Petition on the Record (July 18, 2017), RPD 1–6; Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) From Brazil, the People's Republic of China, Thailand, and the United Arab Emirates: Initiation of Antidumping Duty Investigations, 72 Fed. Reg. 60,801 (Dep't Commerce Oct. 26, 2007) (initiation of investigation).  In proposing the domestic like product to be investigated, Petitioners suggested the definition used by the International Trade Commission ("ITC") in its investigations into PET products from India and Taiwan:

> [A]ll gauges of raw, pretreated, or primed PET film, whether extruded or coextruded.  Excluded are metallized films and other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick.

Petition at 9; Polyethylene Terephthalate Film, Sheet and Strip From India and Taiwan, USITC Publication No. 3518, Inv. Nos. 701–TA–415 and 731–TA–933–934 (June 2002) (Final) ("India and Taiwan ITC Final") at 4, in Scope Ruling Request at Ex. 27.  Terphane, a Brazilian producer of PET film, was a respondent in the ensuing investigation.  Mitsubishi I, 228 F. Supp. 3d at 1365.

Commerce made an affirmative determination of dumping of PET film from Brazil, issued

Terphane a weighted-average dumping margin of 44.36%, and issued an antidumping duty order

on PET Film from Brazil on November 10, 2008.  Id.; see Polyethylene Terephthalate Film, Sheet,

and Strip From Brazil, the People's Republic of China and the United Arab Emirates: Antidumping

Duty Orders and Amended Final Determination of Sales at Less Than Fair Value for the United

Arab Emirates, 73 Fed. Reg. 66,595 (Dep't Commerce Nov. 10, 2008) ("Order").  The scope of

the Order, which identifies the merchandise covered, contained substantially the language

proposed by Petitioners:

> The products covered by each of these orders are all gauges of raw, pre-treated, or
> primed PET film, whether extruded or co-extruded.  Excluded are metallized films
> and other finished films that have had at least one of their surfaces modified by the
> application of a performance-enhancing resinous or inorganic layer more than
> 0.00001 inches thick.  Also excluded is roller transport cleaning film which has at
> least one of its surfaces modified by application of 0.5 micrometers of SBR latex.
> Tracing and drafting film is also excluded.  PET film is classifiable under
> subheading 3920.62.00.90 of the Harmonized Tariff Schedule of the United States
> (HTSUS).  While HTSUS subheadings are provided for convenience and customs
> purposes, our written description of the scope of these orders is dispositive.

Id. at 66,595–96 (emphasis added).  The first two sentences of the Order's scope are at the heart

of subsequent administrative proceedings and ultimately this litigation.  The second sentence,

containing an exclusion for certain PET films, is referred to in this opinion as the Second Sentence

Exclusion.

When a question arises as to whether a particular product is included in an antidumping

duty order, an interested party may apply for a scope ruling from Commerce.  19 C.F.R. §

351.225(a), (c).  While no specific statutory provision governs the interpretation of the scope of

antidumping duty orders, Commerce has filled the statutory gap with a regulatory framework,

which has been interpreted by the Federal Circuit and this Court as a multi-step process.  See

Meridian Prod., LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing Shenyang

Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1354 (Fed. Cir. 2015)); 19

C.F.R. § 351.225.  "Commerce's inquiry must begin with the order's scope to determine whether

it contains an ambiguity and, thus, is susceptible to interpretation."  Meridian Prod., 851 F.3d at

1381; see Fedmet Res. Corp. v. United States, 755 F.3d 912, 920 (Fed. Cir. 2014).

        If the language contains an ambiguity, Commerce must review it in light of "[t]he

descriptions of the merchandise contained in the petition, the initial investigation, and the

determinations of [Commerce] (including prior scope determinations) and the [ITC]."  19 C.F.R.

§ 351.225(k)(1) ("(k)(1) factors"); Whirlpool Corp. v. United States, No. 2017-1117, 2018 WL

2324462, at *3 (Fed. Cir. May 23, 2018).  If these factors are dispositive, the analysis ends, and

Commerce issues a final scope ruling.  See 19 C.F.R. § 351.225(k).  To be dispositive, the (k)(1)

factors must be controlling of the scope inquiry in the sense that they definitively answer the scope

question.  Meridian Prod., 851 F.3d at 1382 n.8 (citing Sango Int'l, L.P. v. United States, 484 F.3d

1371, 1379 (Fed. Cir. 2007)).[2]

        In February 2012, Terphane requested a scope ruling to determine whether four of the PET

film products it manufactures in and imports from Brazil, and sells in the United States

(collectively "Copolymer Surface Films"), are subject to the Order.[3]  Scope Ruling Request; see

19 C.F.R. § 351.225(c).  The thrust of Terphane's argument was, and still is, that its Copolymer

---

[2] If Commerce's analysis under the (k)(1) factors is not dispositive, the agency may consider the
factors set forth in 19 C.F.R. § 351.225(k)(2): (i) the physical characteristics of the product; (ii)
the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels
of trade in which the product is sold; and (v) the manner in which the product is advertised and
displayed.  See Meridian Prod., 851 F.3d at 1382; see generally Diversified Prod. Corp. v. United
States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983) (enunciating the (k)(2) factors prior to their
codification).

[3] These film products are: (1) 10.21132, 10.21140, 10.21148, and 10.21192 (collectively "10.21
products"); (2) 10.81148 ("10.81 product"); (3) 10.91148 ("10.91 product"); and (4) 10.96/48
("10.96 product").  Scope Ruling Request at 2; see Mitsubishi I, 228 F. Supp. 3d at 1366 & n.7.

Surface Films are not covered by the scope of the <u>Order</u> because they all "have a performance-enhancing resinous layer that exceeds the thickness requirement listed in the scope exclusion." <u>Mitsubishi I</u>, 228 F. Supp. 3d at 1366 (quoting Scope Ruling Request at 3).  This resinous layer possesses chemical properties different from the core PET layer or layers to which it is conjoined through coextrusion.

Commerce issued a scope determination on January 7, 2013.  <u>Antidumping Duty Order on PET Film, Sheet, and Strip from Brazil: Final Scope Ruling, Terphane, Inc. and Terphane Ltda.</u>, PD 35, CD 19 (Jan. 7, 2013) ("<u>Terphane Scope Ruling</u>").  The agency found that, pursuant to the Second Sentence Exclusion, Terphane's Copolymer Surface Films were outside the scope of the November 2008 antidumping duty order covering PET film, sheet, and strip from Brazil, provided Terphane could establish, to the satisfaction of United States Customs and Border Protection, that the performance-enhancing layer is greater than 0.00001 inches thick.  <u>Id.</u>

Commerce relied on the factors in 19 C.F.R. § 351.225(k)(1), and found them dispositive with respect to the question of whether Terphane's Copolymer Surface Films come under the Second Sentence Exclusion.  Of the scope language, Commerce reasoned that "even though a particular product may meet the requirements of the first sentence . . . it may also fall under one of the subsequent exclusions and be excluded from the scope of the order," which "is consistent [sic] Department's prior determinations." <u>Terphane Scope Ruling</u> at 11.  Commerce determined that the phrase "extruded or co-extruded," in the first sentence of the scope encompasses PET products regardless of which extrusion method is used, and "does not indicate that all extruded and/or co-extruded films are covered, regardless of the subsequent exclusions." <u>Id.</u> at 12.

## II.     Proceedings Before this Court.

Mitsubishi contested the Terphane Scope Ruling in this court on the following bases:  that it contradicted the plain language of the Order, and was therefore contrary to law; that Commerce's determination that Terphane's films were not dispositively in-scope under 19 C.F.R. § 351.225(k)(1) was unsupported by substantial evidence; and that Commerce's determination that Terphane's films are dispositively out-of-scope under 19 C.F.R. § 351.225(k)(1) was unsupported by substantial evidence.[4]  Mitsubishi I, 228 F. Supp. 3d at 1370 (citing Pl.'s Compl. ¶¶ 11–27, Mar. 8, 2013, ECF No. 13).

Holding that the first two sentences of the scope language are subject to reasonable interpretation, the court agreed that Commerce had met the requisite low threshold to warrant finding ambiguity therein.  Mitsubishi I, 228 F. Supp. 3d at 1371 (citing Meridian Prod., 851 F.3d at 1381 n.6).  The court thus sustained Commerce's determination to proceed to an analysis under 19 C.F.R. § 351.225(k)(1).  Id. at 1374.  However, the court found that Commerce's determination under § 351.225(k)(1) was not supported by substantial evidence, because Commerce did not sufficiently analyze all of the factors listed under  that section.  Id. at 1375.  Noting that an administrative analysis under § 351.225(k)(1) involves "the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce]

---

[4] Mitsubishi additionally argued that the Terphane Scope Ruling was invalidated by delay, because Commerce issued the ruling 320 days after the receipt of Terphane's scope ruling request, rather than within 45 days as called for in 19 C.F.R. § 351.225(c)(2).  Mitsubishi I, 228 F. Supp. 3d at 1381.  The court disagreed with Mitsubishi and held that good cause existed for the delay, observing that courts are "most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake," and noting the voluminous submissions Commerce received in the scope ruling proceeding, as well as Mitsubishi's failure to object to the extension.  Id. at 1381–82 (quoting Brock v. Pierce County, 476 U.S. 253, 260 (1986)).

(including prior scope determinations) and the [ITC]," the court held that Commerce "did not come

to a reasonable conclusion in consideration of the entire administrative record."  Id. at 1375.

Specifically, Commerce did not analyze the "descriptions of the merchandise contained in the

petition, [and] the original investigation" on the record, including those that fairly detract from its

determination, see Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951), such that its

entire analysis dispositively answered the scope question in accordance with the substantial

evidence standard.  Mitsubishi I, 228 F. Supp. 3d at 1377 (quoting 19 C.F.R. § 351.225(k)(1)).

While Commerce had cited the Petition and original antidumping investigation at points in the

Terphane Scope Ruling, it did so to the purpose of summarizing parties' arguments rather than

interpreting the scope language.  Id.  Those cursory references to those materials ran counter to

Commerce's duty to "utilize[] and abide[] by the statutory and regulatory provisions that authorize

[it] to investigate [scope issues]" when making a scope determination.  Shenyang Yuanda

Aluminum Indus. Eng'g Co. v. United States, 40 CIT ___, ___, 181 F. Supp. 3d 1348, 1356 n.15

(2016) (quoting AMS Associates, Inc. v. United States, 737 F.3d 1338, 1344 (Fed. Cir. 2013)).

Moreover, the court found that "Commerce nowhere justified its avoidance of the Petition and

original investigation under its (k)(1) analysis, despite that they contain 'descriptions of the

merchandise' that Commerce is obligated to analyze thereunder."  Mitsubishi I, 228 F. Supp. 3d.

at 1378 (quoting 19 C.F.R. § 351.225(k)(1)).  In remanding the Terphane Scope Ruling for further

consideration of these (k)(1) factors, the court directed Commerce to explain how its findings were

"reached by 'reasoned decision-making,' including . . . a reasoned explanation supported by a

stated connection between the facts and the choice made."  Id. at 1379 (quoting Elec. Consumers

Res. Council v. Fed. Energy Regulatory Comm'n, 747 F.2d 1511, 1513 (D.C. Cir. 1984)).  In

summary, the court concluded that "Commerce must provide further explanation for its decisions

in regard to relevant (k)(1) materials in the record, including those in the Petition and original investigation which it did not analyze in the original determination, on remand." Id.

### III.   **Remand Proceedings Before Commerce.**

During the remand phase, on July 18, 2017, Commerce placed the complete public version of the Petition on the record and asked interested parties for comments, receiving none. Remand Results at 7; Commerce's Ex Parte Memo Placing Petition on the Record. On September 21, 2017, Commerce issued a draft remand redetermination. RPD 7. Terphane submitted comments on the draft on September 26, 2017. RPD 8. Petitioners filed their comments on October 10, 2017. RPD 14. As noted, on October 20, 2017, Commerce issued its final Remand Results, in which it continued to find that Terphane's films are out-of-scope of the Order.

In accordance with the court's instructions in Mitsubishi I, Commerce on remand considered in depth "the descriptions of the merchandise contained in the petition, [and] the initial investigation." Remand Results at 8–22. Commerce noted that it placed the complete original Petition on the record and solicited comments from interested parties. Id. at 10. Commerce quoted the Petition's general categorical description of "PET film," which included language from Commerce's antidumping investigation of PET film from India and Taiwan that would ultimately constitute the two scope sentences of the underlying antidumping duty Order at issue here. Id. (quoting Petition at 9). Commerce noted the Petition's statement that "PET film can be made as a single layer or can be coextruded with other polymers into a multilayer film." Id. (quoting Petition at 10). Further, Commerce included the Petition's explanation that

> PET film is "raw, pretreated, or primed" base film at the end of the production
> process.  Additional treatment or processing may be done to the PET film before it
> reaches the customer (frequently by converters), although the film may also be sold
> direct to end-use customers or distributors.

Id. at 10–11 (quoting Petition at 10–11).  Commerce stated that its "further analysis of the Petition indicates that the Petitioners' description of the subject merchandise in the Petition, besides re-stating the scope language used in each of the previous PET film proceedings, also places special emphasis on the thickness of any coating (i.e., a performance-enhancing resinous or inorganic layer)."  Id. at 11 (citation omitted).

Commerce also analyzed descriptions of the merchandise in the initial investigation. Commerce summarized numerous excerpts from Petitioners' March 23, 2012 Comments ("Pets' 2012 Comments"), PD 9, and May 7, 2012 Questionnaire Responses ("Pets' 2012 QR"), PD 21–22, that contain details from the initial antidumping investigation.  Those references included Petitioners' claim that the Copolymer Surface Films were considered in-scope at the time of the investigation, and Petitioners' supporting claim that they had suffered injury due to inroads made by Terphane into the packaging market with coextruded films.  Remand Results at 12–13 (citing Pets' 2012 QR at 7–10, 16, nn.4, 55; Pets' 2012 Comments at 8, 13, 19, Exs. 2–3).  Commerce recited Petitioners' complaint about Terphane's offer for sale of heat-sealable film, which they claimed was similar to a thermo-sealable 10.96/48 Copolymer Surface Product at issue, in the "Lost Sales" section of the Petition.  Id. at 12 (citing Pets' 2012 QR at 8; Petition at 85).  Commerce also noted Petitioners' claim that they intended for all of the Copolymer Surface Films to fall within the scope of the Order, and their claim that Commerce, Petitioners, and Terphane all considered those films to be subject merchandise during the investigation.  Id. at 13 (citing Pets' 2012 QR at 8).  Petitioners further claimed that they manufactured films that compete directly with the products at issue, including in-scope PET film sold by Mitsubishi and DuPont Tejin Films, which they asserted are commercially equivalent to Terphane's 10.21, 10.81, and 10.96 products. Id. (citing Pets' 2012 QR at 2, 16, nn.4, 55).

Commerce mentioned Petitioners' claim that in the parallel PET film from the UAE proceeding, "Petitioners, respondents, and [Commerce] [took] it for granted that co-extruded films that are commercially identical to Terphane's are covered by the scope of the order." Id. at 14 (quoting Pets' 2012 QR at 3, Ex. 7).

Next, Commerce referenced Petitioners' claim that "[i]n response to the Section B questionnaire" in the initial investigation, "Terphane took it for granted that COEX films fell within the scope," as well as Petitioners' notation that Terphane's Section A questionnaire response indicated that Terphane's commercial product codes classified the products at issue as "thin, plain" films, not as "coated" films. Remand Results at 14 (citing Pets' 2012 QR at 13, Exs. 4 (Sec. A Questionnaire), 12).

Commerce also discussed Terphane's objections, in its May 17, 2012 Comments ("Terphane's 2012 Comments"), PD 23, CD 15, to Petitioners' claims that Commerce and parties considered the products at issue to be subject merchandise during the investigation. Remand Results at 15. Terphane asserted that Petitioners' references to the description of coextrusion in Terphane's Section A questionnaire response (from the investigation) were misleading because Terphane coextrudes other copolymer films, besides those at issue, and also coextrudes films without any copolymer or performance-enhancing layers. Id. at 15–16 (citing Terphane's 2012 Comments at 4–5). Commerce noted Terphane's argument that its application of the "thin, plain" films designation, rather than its "thin, coated" films designation, merely related to commercial product codes used for internal business purposes, and was unrelated to the context of an antidumping proceeding. Id. at 16 (citing Terphane's 2012 Comments at 6).

Analyzing these (k)(1) factors, Commerce concluded that "[t]he Petition and information from the investigation do not indicate that the Petitioners intended the products at issue or

copolymer coextruded films which have performance-enhancing layers greater than 0.00001 inches in thickness to be covered by the scope of the <u>Order</u>." <u>Remand Results</u> at 16.  Commerce determined that Petitioners "provided no explanation of why it [sic] believes the product they had mentioned in the Petition and which Terphane offered for sale, was similar to Terphane's 10.96/48 film. . . . [t]he only alleged similarity between these films which record evidence appears to speak to is their heat-sealability." <u>Id.</u> at 17 (citing Pets' 2017 Comments at 6, n. 20, Exs. 2–3).  Thus, "[t]he fact that an allegedly in-scope product shares this one performance-enhancing characteristic does not serve to prove that the 10.96/48 product, Terphane's heat-sealable products as a whole, or any of the products at issue are covered by the scope." <u>Id.</u>  Because Terphane demonstrated that it produces coextruded copolymer films and coextruded commodity films without copolymer or performance-enhancing layers, Commerce found unpersuasive Petitioners' argument that Terphane described its coextruded films and coextrusion manufacturing process in response to Commerce's questions about subject merchandise.  <u>Id.</u> at 19 (citing Terphane's 2012 Comments at 5 n. 15, Exs. 1–2).  Commerce also found insignificant Petitioners' citation to Terphane's usage of commercial product codes classifying the products at issue as "thin, plain" films, because that classification context is not analogous to construction of the scope's phraseology.  <u>Id.</u>  Commerce further found inapposite Petitioners' reference to the PET film from the UAE proceeding, as those statements show only that the respondent there produced and sold coextruded films, not that Commerce, Petitioners, or respondents considered coextruded polymer films with the specific performance-enhancing, thickness, and other requisite characteristics of Terphane's products at issue to be covered by the scope.  <u>Id.</u> at 20.

Moreover, Commerce disagreed with Petitioners' suggestion that films manufactured by Mitsubishi, which Petitioners considered to be subject merchandise, were relevantly similar or

identical to the products at issue.  Id.  Commerce found that Petitioners failed to provide relevant details about those products -- which they manufacture -- or to explain why they were similar or identical to the products at issue.  Id.  Further, certain of the products mentioned by Petitioners were claimed to be "almost identical" to Terphane's 10.51 products,[5] which were not at issue in the scope inquiry.  Id. at 20–21 (citing Terphane's 2012 Comments at 17, Ex. 2).

Also in accordance with the dictates of § 351.225(k)(1), and the court's instructions in Mitsubishi I, Commerce revisited the descriptions of the merchandise in prior determinations.  It further considered two of its own prior decisions, Garware[6] and Avery Dennison.[7]  Remand Results at 22–27.  Additionally, Commerce considered the descriptions of the merchandise contained in multiple ITC determinations regarding PET film: Japan and Korea ITC Final;[8] India and Taiwan ITC Final; India and Taiwan Staff Report;[9] and Brazil, Thailand, and the UAE ITC

---

[5] Commerce found that record evidence indicates the 10.51 products have a "thin surface treatment" and were reported by Terphane in the investigation to be covered by the scope of the Order.  Remand Results at 21 (citing Pets' 2012 Comments at 6, Ex. 2; Pet's May 7, 2012 QR at 13, Ex. 4; Terphane's 2012 Comments at 17, Exs. 1–2; Pets' May 17, 2012 Comments at Ex. 1).

[6] Antidumping and Countervailing Duty Orders on Polyethylene Terephthalate Film, Sheet, and Strip from India, Final Scope Ruling–Requested by International Packaging Films, Inc. Regarding Tracing and Drafting Film (Aug. 25, 2013) in Scope Ruling Request at Ex. 31.

[7] Memorandum from Michael J. Heaney to Stephen J. Claeys, Antidumping Duty Investigations on Polyethylene Terephthalate Film, Sheet, and Strip (PET film) from Brazil, the People's Republic of China, Thailand, and the United Arab Emirates, A–351–841, A–570–924, A–549–825, A–520–803 (investigations), Apr. 25, 2008 in Pets' Mar. 23 Comments at Ex. 9.

[8] Polyethylene Terephthalate Film, Sheet, and Strip From Japan and the Republic of Korea, USITC Pub. No. 2383, Inv. No. 731–TA–458 and 459 (May 1991) (Final) in Scope Ruling Request at Ex. 25.

[9] PET Film from India and Taiwan, Staff Report to the Commission Inv. Nos. 701–TA–415 and 731–TA–933–934 (Final), (May 28, 2002) in Scope Ruling Request at Ex. 26.

Final.[10] Remand Results at 27–37.  Commerce explained that the ITC determinations give primary emphasis to the thickness of the performance-enhancing layer, rather than considerations such as the production process used to append that layer to other PET layers.  Id. at 32–35.  Accordingly, Commerce considered language that describes PET film as being manufactured on dedicated machinery, and determined that it originated in the Japan and Korea ITC Final, and was referenced in the subsequent investigations.  Remand Results at 36.  Commerce stated it found "that there is nothing in the written scope of the order or in [its] analysis of the (k)(1) factors which would lead to the conclusion that a particular production process is necessary for a product to be equivalent PET film."  Id. at 35.  The production processes that may have been used to produce DuPont Cronar and Kodak Estar -- two examples of equivalent PET film,[11] see Mitsubishi I, 228 F. Supp. 3d at 1368 -- thus were not central to Commerce's analysis.  Remand Results at 35.  "To be clear," Commerce wrote, "we find differences in production processes or methods that do not yield differences in physical characteristics to be an insufficient basis for treating products differently for purposes of applications of the dumping laws."  Id.  Rather, Commerce determined that the ITC referenced production processes used to manufacture equivalent PET film were considered

---

[10] Polyethylene Terephthalate Film, Sheet, & Strip From Brazil, China, Thailand, & the United Arab Emirates, USITC Pub. No. 4040, Inv. No. 731–TA–1131–1134 (Oct. 2008) (Final) in Scope Ruling Request at Ex. 29.

[11] In response to the court's statement in Mitsubishi I, 228 F. Supp. 3d at 1380, that "Commerce should also clarify whether equivalent PET refers solely to those films excluded under the second sentence exclusion, or one that is a term of art in the industry," Commerce explained that "[a]ll available evidence points to the conclusion that the term 'equivalent PET film' is not an industry term of art."  Remand Results at 39.  Instead, that term was first deployed in the Japan and Korea ITC Final, where it was used to mean "other finished films that have had at least one of their surfaces modified by the application of a performance-enhancing resinous or inorganic layer more than 0.00001 inches thick," including, as the paradigmatic examples, Cronar and Estar, as well as "other PET film equivalent to Cronar and Estar."  Id. (quoting Japan and Korea ITC Final at 6–7).

technically necessary, at the time of the investigations, to produce the physical properties of

equivalent PET film.  Id. at 35–37.  For that reason, Commerce found language from the ITC

investigations regarding equivalent PET production processes to be "descriptive, not definitive or

dispositive."  Id. at 36.  Accordingly, as it had in the original Terphane Scope Ruling, Commerce

continued to find that the descriptions of the merchandise in its own and the ITC's prior

determinations support the conclusion that Terphane's Copolymer Surface Films are not within

the scope of the Order.  Id. at 27, 37.

    Mitsubishi filed its comments on the Remand Results on November 20, 2017.  Pl.'s Br.

The Government and Terphane each filed comments in reply on December 15, 2017.  Def.'s Br.;

Def.-Inter.'s Br.  Oral argument was held before the court on May 29, 2018.  Oral Arg., ECF No.

123.

## STANDARD OF REVIEW

    The court reviews Commerce's remand redeterminations in accordance with the standard

set forth in 19 U.S.C. § 1516a(b)(1)(B)(i), and thus "shall hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law."

## DISCUSSION

    Specific to the issues in this case, and as noted supra, § 351.225(k) requires that the (k)(1)

factors be "dispositive" of the relevant scope ambiguity in order for Commerce's analysis to be

valid.  Mitsubishi I, 228 F. Supp. 3d at 1381 (citing Meridian Prod., 851 F.3d at 1382 n.8);

Meridian Prod. v. United States, No. 2016-2657, 2018 WL 2306281, at *4 (Fed. Cir. May 22,

2018).  "'Dispositive' means . . . [that] the section 351.225(k)(1) criteria must be 'controlling' of

the scope inquiry in the sense that they definitively answer the scope question."  Sango, 484 F.3d

at 1379.  The court shall uphold Commerce's scope ruling if it is supported by substantial evidence

on the record and otherwise in accordance with law.  <u>Whirlpool</u>, 2018 WL 2324462, at *3.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  <u>Id.</u> (quoting <u>Eckstrom Indus., Inc. v. United States</u>, 254 F.3d 1068, 1071

(Fed. Cir. 2001)).  Moreover, "the substantial evidence standard requires review of the entire

administrative record" and asks, in light of that evidence, whether Commerce's determination was

reasonable.  <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006).  Therefore,

to sustain Commerce's <u>Remand Results</u>, the court must conclude that substantial evidence on the

record supports Commerce's determination that the (k)(1) factors definitively resolve the

ambiguity in the scope language.

Further, the court "afford[s] significant deference to Commerce's own interpretation of its

orders, mindful that scope determinations are 'highly fact-intensive and case-specific.'"  <u>Meridian</u>

<u>Prod.</u>, 2018 WL 2306281 at *4 (quoting <u>King Supply Co. v. United States</u>, 674 F.3d 1343, 1345,

1348 (Fed. Cir. 2012)).  Commerce "enjoys substantial freedom to interpret and clarify its

antidumping duty orders . . . , [but] it may not change them."  <u>Whirlpool</u>, 2018 WL 2324462 at *4

(quoting <u>Ericsson GE Mobile Commc'ns, Inc. v. United States</u>, 60 F.3d 778, 782 (Fed. Cir. 1995),

<u>as corrected on reh'g</u> (Sept. 1, 1995)).  An order may not be interpreted "in a way contrary to its

terms," nor in a way "so as to change the scope of that order."  <u>Id.</u> (citations omitted).

**I.**     **<u>Commerce's Determination that the (k)(1) Factors Dispositively Place Terphane's</u>**
        **<u>Copolymer Surface Products Outside of the Scope of the Order is Supported by</u>**
        **<u>Substantial Evidence.</u>**

Mitsubishi first argues that Commerce fails to explain how the (k)(1) factors

"dispositive[ly]" indicate that Terphane's films are out of scope.  Pl.'s Br. at 3.  Here, Mitsubishi

states, "the relevant ambiguity is whether a coextruded film can, in virtue of coextrusion, qualify

as an equivalent PET film that is out-of-scope," and more generally "whether the Second Sentence

Exclusion can apply to a films [sic] that have no post-extrusion coating." Id. Mitsubishi argues

that Commerce failed to address these questions on remand, and instead reiterated observations it

had made in the original Terphane Scope Ruling. Id. at 4. Summarizing and challenging

Commerce's findings under each of the categories of (k)(1) factors, Mitsubishi further asserts that

Commerce did not find that any of the (k)(1) factors indicates dispositively that the Second

Sentence Exclusion applies to films with no post-extrusion coatings. Id. at 5–6.

        Mitsubishi is incorrect, and its arguments are unpersuasive. As an initial matter, the Second

Sentence Exclusion does not require a "post-extrusion coating," as Mitsubishi presumes, but refers

instead to a "performance-enhancing resinous or inorganic layer more than 0.00001 inches thick."

Order at 66,595–96. To the extent that this characterization suggests a layer must have been added

to a preexisting PET film product as a "coating," the court has already rejected that argument. In

Mitsubishi I, 228 F. Supp. 3d at 1373, the court stated that "[n]o language in the scope commands

that a 'finished film' must 'have had' one of its 'surfaces' 'modified by the application of' a

protective resinous or inorganic layer of sufficient thickness in a specific chronology, other than,

necessarily, prior to import."

        If Commerce wishes to identify a particular production process necessary for the exclusion

of otherwise subject merchandise from an order's scope, then it may do so in the scope's plain

language. See Diffusion-Annealed, Nickel-Plated, Flat-Rolled Steel Products From Japan, 82 Fed.

Reg. 26,046, 26,046 (Dep't Commerce June 6, 2017) (preliminary administrative review) ("The

diffusion-annealed, nickel-plated flat-rolled steel products included in this order are flat-rolled,

cold-reduced steel products, regardless of chemistry; whether or not in coils; either plated or coated

with nickel or nickel-based alloys and subsequently annealed (i.e., "diffusion-annealed") . . . .")

(emphasis added); Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002)

("Scope orders may be interpreted as including subject merchandise only if they contain language

that specifically includes the subject merchandise or may be reasonably interpreted to include it.").

Petitioners, for their part, may include phraseology to that effect when they suggest scope language

to Commerce.  Neither Commerce nor Petitioners did so here.  See Mitsubishi I, 228 F. Supp. 3d

at 1365 (quoting Petition at 9).  The Second Sentence Exclusion, however, does not implicate any

production processes, and, as the court has previously held, is subject to reasonable interpretation

and analysis under § 351.225(k)(1).  Id. at 1373; see Duferco, 296 F.3d at 1097 ("[R]eview of the

petition and the investigation may provide valuable guidance as to the interpretation of the final

order.  But they cannot substitute for language in the order itself.").

     Working pursuant to the regulation, Commerce affirmatively resolved the interpretive

question of whether the Second Sentence Exclusion covers films with performance-enhancing

layer added through coextrusion.  Commerce's determination that the (k)(1) factors are dispositive

with respect to the relevant ambiguity is supported by substantial evidence.  "[T]o be 'dispositive,'

the section 351.225(k)(1) criteria must be 'controlling' of the scope inquiry in the sense that they

definitively answer the scope question."  Sango, 484 F.3d at 1379.  As described supra, Commerce

analyzed each of the (k)(1) factors and drew multiple conclusions about the scope language based

on that record evidence.  Notably, Commerce concluded that the descriptions of the merchandise

contained in the (k)(1) factors consistently emphasized the "thickness of the requisite performance-

enhancing layer as the definitive factor in differentiating between subject and non-subject films."

Remand Results at 14.  Relatedly, Commerce explained that, per its analysis of the (k)(1) factors,

the Second Sentence Exclusion does not take into account what production process was used to

apply the performance-enhancing layer with requisite physical characteristics and thickness.  Id.

at 32.  Therefore, Terphane's Copolymer Surface Films, whose performance-enhancing layers of requisite thickness and physical characteristics are added through coextrusion, are covered by the Second Sentence Exclusion.  Quite apart from the court's provision of "significant deference to Commerce's own interpretation of its orders," <u>Meridian Prod.</u>, 2018 WL 2306281 at *4, a reasonable mind would accept as adequate Commerce's conclusion that the (k)(1) factors are dispositive, or controlling, in that they definitively answer the relevant interpretive inquiry.  <u>See</u> <u>Whirlpool</u>, 2018 WL 2324462 at *3.  Mitsubishi does not demonstrate that Commerce's findings are unreasonable or divorced from its analysis of the (k)(1) factors.

Mitsubishi also fails to articulate precisely how Commerce's analysis leaves doubt that the (k)(1) factors, as considered on remand, are dispositive of the relevant interpretive question. Mitsubishi essentially contends that Commerce failed to satisfy the regulation, having merely "reiterated observations that it had previously made in the <u>Terphane Scope Determination</u> . . . [and] weigh[ed] various categories of evidence and ma[d]e a judgment about the preponderance of the evidence."  Pl.'s Br. at 4–5.  But as explained, Commerce's analysis, and conclusion that the (k)(1) factors are controlling of the relevant inquiry, were drawn directly from, and based on, substantial record evidence.  Altogether, Commerce "examine[d] the record and articulate[d] a satisfactory explanation for its actions."  <u>CS Wind Vietnam, Co. Ltd. v. United States</u>, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting <u>Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States</u>, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).  Mitsubishi's dissection of Commerce's analysis of each (k)(1) factor, and its suggestion that none of them is individually dispositive, is similarly unpersuasive. Pl.'s Br. at 5–6. Mitsubishi offers no authority dictating that any (k)(1) factor must be dispositive of the relevant interpretive inquiry in order for Commerce's determination under that section to stand.  <u>Id.</u>  Rather, § 351.225(k)(2) activates "[w]hen the above criteria are not dispositive."

## II.    Commerce's Interpretation of the (k)(1) Factors Does Not Dispositively Place Terphane's Copolymer Surface Films Within the Order's Scope.

Mitsubishi next argues that Commerce's own review of the record as to the (k)(1) factors compels the conclusion that Terphane's films are in-scope.  Pl.'s Br. at 7.  Regarding the prior ITC investigations, Mitsubishi points to Commerce's statement that:

> The ITC's description of the evidence in the Japan and Korea Investigations strongly implies that this production process [for equivalent PET film] did involve either off-line processing or in-line processing on dedicated machinery at the time of the Japan and Korea investigations.

Pl.'s Br. at 7 (quoting Remand Results at 30).  Mitsubishi asserts that Commerce interpreted other prior ITC determinations -- including the India and Taiwan ITC Final, and the Brazil, Thailand, and the UAE ITC Final -- to indicate that off-line coating or online dedicated machinery are technologically necessary for the production of equivalent PET film.  Id. at 7–9 (citing Remand Results at 35).

Mitsubishi is incorrect.  Commerce did not find that equivalent PET film -- those films which come under the Second Sentence Exception -- need to be produced either on-line with dedicated machinery or off-line.  To the contrary, Commerce clearly explained "that there is nothing in the written scope of the order or in [its] analysis of the (k)(1) factors which would lead to the conclusion that a particular production process is necessary for a product to be equivalent PET film."  Id. at 35.  As explained supra, the court agrees that the Second Sentence Exclusion does not implicate any particular production processes, and reiterates that Commerce could have included, and Petitioners could have suggested, language specifying production processes at the initial phases of the investigation had they considered those processes necessary.  Commerce, "[t]o be clear," further explained in the Remand Results that it found "differences in production processes or methods that do not yield differences in physical characteristics to be an insufficient

basis for treating products differently for purposes of applications of the dumping laws." <u>Remand</u>

<u>Results</u> at 35.   Rather, Commerce determined that the ITC referenced production processes used

to manufacture equivalent PET film that were considered technically necessary, at the time of

those investigations, to produce the physical properties of equivalent PET film.   <u>Id.</u> at 35–37.

Commerce's analysis of the scope language, which is owed significant deference, <u>Meridian Prod.</u>,

2018 WL 2306281 at *4, is reasonable, and does not at all run contrary to the terms of the scope.

<u>See</u> <u>Whirlpool</u>, 2018 WL 2324462 at *3.

**III.   <u>Commerce's Consideration of the Petition is in Accordance with Law and</u>
<u>Supported by Substantial Evidence.</u>**

Finally, Mitsubishi argues that Commerce failed to provide "an informed and meaningful

assessment of the Petition" as required under § 351.225(k)(1).   Pl.'s Br. at 10 (quoting <u>Mitsubishi</u>

<u>I</u>, 228 F. Supp. 3d at 1377).   Mitsubishi highlights text from the Petition stating:

> PET film is "raw, pretreated, or primed" base film at the end of the production
> process.   Additional treatment or processing may be done to the PET film before it
> reaches the customer (frequently by converters), although the film may also be sold
> direct to end-use customers or distributors.

<u>Id.</u> (quoting Petition at 10–11).   This statement, Mitsubishi contends, distinguishes PET film "at

the end of the production process," by which time coextrusion will already have occurred, from

PET film at the time it reaches the customer.   <u>Id.</u>   Between those two phases, "[a]dditional

treatment or processing" may occur.   <u>Id.</u>   Per Mitsubishi, this interstitial step corresponds to the

scope language's reference to "finished films that have had at least one of their surfaces modified

by the application of a . . . layer," <u>i.e.</u> the Second Sentence Exclusion.   <u>Id.</u> at 11.   Mitsubishi argues

that this description in the Petition indicates that the Second Sentence Exclusion can apply only to

post-extruded coatings, and not to coextruded layers such as those on Terphane's Copolymer

Surface Films.   <u>Id.</u>   Mitsubishi asserts that Commerce failed to reconcile this evidence from the

Petition with the interpretive question of whether the Sentence Second Exclusion applies to films with no post-extrusion coating. Id. at 12.

Mitsubishi's singular citation to the Petition, and its corresponding argument, are not persuasive. Commerce performed "an informed and meaningful assessment of the Petition," described supra, in accordance with § 351.225(k)(1), and came to reasonable conclusions on the basis of that assessment. Mitsubishi I, 228 F. Supp. 3d at 1377 (quoting Shenyang, 181 F. Supp. 3d at 1356). Specifically, Commerce recited and analyzed multiple descriptions of the merchandise contained in the Petition, including the sentences quoted by Mitsubishi and others that fairly detract from its determination, see Universal Camera, 340 U.S. at 488, and concluded: "Our further analysis of the Petition indicates that the Petitioners' description of the subject merchandise in the Petition, besides re-stating the scope language used in each of the previous PET film proceedings, also places special emphasis on the thickness of any coating (i.e., a performance-enhancing resinous or inorganic layer)[.]" Remand Results at 11 (citations omitted). Commerce further found that Petitioners' statements in the Petition did not speak to the interpretive issue of whether coextruded films are covered by the scope language. Id. at 18.

Moreover, Mitsubishi's quotation of the Petition does not state that PET film must undergo "additional treatment or processing" "at the end of the production process" and "before it reaches the consumer" in order to possess the performance-enhancing layer described in the Second Sentence Exclusion. Petition at 10–11. Commerce reasonably assessed the Petition and came to a different conclusion that is consistent with its appraisal of the other (k)(1) factors and with the terms of the scope. See Whirlpool, 2018 WL 2324462 at *3; Mitsubishi I, 228 F. Supp. 3d at 1373 (holding that the Second Sentence Exclusion language demands no "specific chronology, other than, necessarily, prior to import"). Indeed, as explained supra, upon review of the (k)(1) factors,

in particular prior determinations of the ITC, Commerce found that the Second Sentence Exclusion

does not dictate the production process used to imbue PET film with the performance-enhancing

layer.  See Remand Results at 35–36, 56–57.

## CONCLUSION

For the foregoing reasons, Commerce's Remand Results are in accordance with the court's

remand instructions in Mitsubishi I and are supported by substantial record evidence.  The court

thus sustains the Remand Results in their entirety.  Judgment will enter accordingly.

**SO ORDERED**.

*/s/   Gary S. Katzmann*
 Gary S. Katzmann, Judge


 Dated:  June 19, 2018
              New York, New York